**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| **JESSICA DEARDORFF, et al.**, <br><br> Plaintiffs, <br><br> *v.* <br><br> **CELLULAR SALES OF KNOXVILLE, INC., et al.,** <br><br> Defendants. | **CIVIL ACTION** <br><br><br> **NO. 19-2642-KSM** |

<u>**MEMORANDUM**</u>

**MARSTON, J.**                                              **February 1, 2022**

On June 18, 2019, Plaintiffs Jessica Deardorff and David Chapman, on behalf of themselves and all others similarly situated, filed this class action lawsuit against Defendants Cellular Sales of Knoxville, Inc. ("CSOKI"), Cellular Sales of Pennsylvania ("CSPA"), and Cellular Sales of North Carolina, LLC ("CSNC").  Plaintiffs allege that Defendants failed to pay them proper overtime compensation in violation of the Fair Labor Standards Act ("FLSA") and equivalent state statutes.  (Doc. No. 33.)

In September 2019, CSPA moved to compel individual arbitration of Deardorff's claims and to dismiss or transfer Chapman's and the opt-in Plaintiffs' claims.  (Doc. Nos. 12, 43.)  Shortly thereafter, in November 2019, CSOKI and CSNC moved to dismiss all claims for lack of personal jurisdiction.  (Doc. No. 65.)  On August 25, 2020, the Court dismissed CSNC as a Defendant and found that limited jurisdictional discovery was appropriate to determine whether this Court may exercise personal jurisdiction over CSOKI.  (Doc. Nos. 133–34.)[1]  After the

---

[1] The parties agreed that the Court should decide the motion for personal jurisdiction before the motion to compel arbitration.  Although the Court reserves ruling on the motion to compel arbitration, the instant

parties engaged in limited jurisdictional discovery, on January 12, 2021, Plaintiffs filed a supplemental brief opposing Defendants' motion to dismiss CSOKI for lack of personal jurisdiction (Doc. No. 142).  In their supplemental brief, Plaintiffs now argue that this Court may exercise personal jurisdiction over CSOKI under the alter ego theory—i.e., CSPA (an entity that is undisputedly subject to this Court's personal jurisdiction) and CSOKI's other subsidiaries act as alter egos of CSOKI within this forum.  (*Id.*)  Defendants disagree.  (Doc. No. 147.)

About a month later, Plaintiffs filed a motion for leave to file a second amended complaint, in which they seek to add Cellular Sales Management Group, LLC ("CSMG") and Cellular Sales Services Group, LLC ("CSSG") as defendants.  (Doc. No. 146.)  Defendants oppose the motion.  (Doc. No. 148.)

For the reasons discussed below, the Court grants CSOKI's motion to dismiss for lack of personal jurisdiction and denies Plaintiffs' motion to amend.

# I.     Discussion

## A.     *Motion to Dismiss for Lack of Personal Jurisdiction*

First, the Court turns to CSOKI's motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2).  As this Court explained previously, Plaintiffs bear the burden of establishing that personal jurisdiction over CSOKI is proper and must do so with competent evidence.[2]  *Deardorff v. Cellular Sales of Knoxville, Inc.*, Civil

---

briefing revealed the following:  Significantly, Plaintiffs' counsel initiated four separate arbitration proceedings on behalf of four individuals who had previously filed Consent to Sue forms in this action.  (*See* Doc. No. 148-1 at ¶ 6.)  Those arbitration proceedings were initiated pursuant to the *very same arbitration clause* that is at issue in this case—i.e., the clause in Deardorff and Chapman's Dealer Compensation Agreements ("DCAs") that Plaintiffs argue is invalid and unenforceable here.  (*See generally* Doc. No. 52-1.)

[2] "The burden of demonstrating the facts that establish personal jurisdiction falls on the plaintiff," *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009), and the plaintiff must do so with "'reasonable particularity,'" *Batista v. O'Jays, Inc.*, Civil Action No. 18-0636, 2019 WL 400060, at *3 (E.D. Pa. Jan. 30, 2019) (quoting *Mellon Bank PSFS, Nat'l Ass'n v. Farino*, 960 F.3d 1217, 1223 (3d Cir.

Action No. 19-2642-KSM, 2020 WL 5017522, at *2 (E.D. Pa. Aug. 25, 2020).[3]  This Court found that Plaintiffs failed to meet their burden of establishing a *prima facie* case of personal jurisdiction as to CSOKI.  *See generally id.*  However, given the liberal standard in this Circuit for jurisdictional discovery, the Court permitted Plaintiffs to take limited jurisdictional discovery.  *Id.* at *7–9 (explaining that Plaintiffs could seek limited jurisdictional discovery related to:  (1) any records showing that CSOKI or its agents are registered in Pennsylvania and conduct business in that state, either under the name CSOKI, or other names, and (2) CSOKI's corporate structure to discern whether individuals or divisions tasked with creation, implementation and oversight of the challenged policies sit and conduct operations in this forum).

Following jurisdictional discovery, Plaintiffs filed a supplemental memorandum opposing CSOKI's motion to dismiss for lack of personal jurisdiction.  (Doc. No. 142.)  Plaintiffs argue that this Court may exercise personal jurisdiction over CSOKI (the parent holding company) pursuant to the alter ego theory, since it is undisputed that this Court already has personal jurisdiction over CSPA (the subsidiary).  (*Id.*)  Plaintiffs assert that CSOKI— through two of its other wholly owned subsidiaries, CSSG and CSMG—exercises control over CSPA's day-to-day operations.  (*Id.*)  In response, CSOKI maintains that because it is simply a holding company and does not conduct business operations, does not conduct sales or provide

---

1992)).  Where, as here, a court does not hold an evidentiary hearing, the plaintiff need only state a *prima facie* case of personal jurisdiction.  *Metcalfe*, 566 F.3d at 330.  In reviewing a Rule 12(b)(2) motion, "a court must accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff."  *Lionti v. Dipna, Inc.*, Civil Action No. 17-01678, 2017 WL 2779576, at *1 (E.D. Pa. June 27, 2017) (cleaned up).  Nonetheless, "once a defendant has raised a jurisdictional defense, the plaintiff must prove by affidavits or other competent evidence that jurisdiction is proper."  *Metcalfe*, 566 F.3d at 330.

[3] Because we write for the parties, the Court does not restate the law on general and specific personal jurisdiction, which we outlined in our prior opinion.  *See id.* at *2–3.

any products or other services, and does not have employees, the alter ego doctrine is inapplicable and this Court cannot exercise personal jurisdiction over it.  (Doc. No. 147.)

1.   Alter Ego Legal Standard

"A court exercises personal jurisdiction over a parent corporation through its personal jurisdiction over a subsidiary by way of the alter ego theory."  *Lutz v. Rakuten, Inc.*, 376 F. Supp. 3d 455, 470 (E.D. Pa. 2019); *see also Atl. Pier Assocs., LLC v. Boardakan Rest. Partners L.P.*, Civil Action No. 08-4564, 2010 WL 3069607, at *3 (E.D. Pa. Aug. 2, 2010) ("It is well settled that a court may exercise personal jurisdiction . . . over a corporate entity that is the alter ego of a party over which jurisdiction is proper.").  Under the alter ego theory, "if a subsidiary is merely the agent of a parent corporation, or if the parent corporation otherwise 'controls' the subsidiary, then personal jurisdiction exists over the parent whenever personal jurisdiction (whether general or specific) exists over the subsidiary."  *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 781 (3d Cir. 2018).  "[T]he alter ego test looks to whether the degree of control exercised by the parent is greater than normally associated with common ownership and directorship and whether the parent controls the day-to-day operations of the subsidiary such that the subsidiary can be said to be a mere department of the parent."  *In re Enterprise Rent-A-Car Wage & Hour Emp't Pracs. Litig.*, 735 F. Supp. 2d 277, 319 (W.D. Pa. 2010), *aff'd*, 683 F.3d 462 (3d Cir. 2012) ("*In re Enterprise*"); *see also Reynolds v. Turning Point Holding Co.*, Case No. 2:19-cv-01935-JDW, 2020 WL 953279, at *3 (E.D. Pa. Feb. 26, 2020) (cleaned up).  There is "a 'strong presumption' against . . . deeming companies alter-egos of each other."  *Reynolds*, 2020 WL 953279, at *3 (citations omitted).

Courts in this Circuit consider ten factors to determine whether a subsidiary is the alter ego of its parent:

(1) the parent owns all or a significant majority of the subsidiary's stock; (2) common officers and directors; (3) a common marketing image; (4) common use of a trademark or logo; (5) common use of employees; (6) integrated sales system; (7) interchange of managerial and supervisory personnel; (8) the subsidiary performs business functions that would ordinarily be handled by a parent corporation; (9) the subsidiary acts as the marketing arm of the parent corporation or as an exclusive distributor; and (10) the parent exercises control or provides instruction to the subsidiary's officers and directors.

*See In re Chocolate Confectionary Antitrust Litig.*, 674 F. Supp. 2d 580, 598 (M.D. Pa. 2009) ("*In re Chocolate*"); *Lutz*, 376 F. Supp. 3d at 471; *Atl. Pier Assocs.*, 2010 WL 3069607, at *3. "No one aspect of the relationship between two corporations unilaterally disposes of the analysis, and the court may consider any evidence bearing on the corporations' functional interrelationship." *In re Chocolate*, 674 F. Supp. 3d at 598.

## 2. Analysis

The Court finds that the first four factors point towards a finding that CSPA is an alter ego of CSOKI. However, the remaining six factors cut the other way. Therefore, the Court concludes that Plaintiffs have failed to show that CSPA is an alter ego of CSOKI. We address each factor in turn.

*** 

**Factor 1**. Because CSPA is a wholly owned subsidiary of CSOKI (Doc. No. 65-3 at ¶ 6; Doc. No. 142-5 at 124:20–22, 132:18–20), the first factor weighs in favor of a finding of alter ego.

**Factor 2**. The second factor looks to whether the parent and subsidiary share common officers. Pamela White is an officer of both CSOKI and CSPA. (Doc. No. 65-3 at ¶¶ 2–3.) Specifically, she is the Chief Financial Officer, Vice President, and Secretary of CSOKI and the President, Treasurer, and Secretary of CSPA. (*Id.*) As other courts in this Circuit have noted, however, this kind of overlap is to be expected in a subsidiary-parent relationship. *See, e.g.*, *In*

*re Latex Gloves Prods. Liab. Litig.*, No. MDL 1148, 2001 WL 964105, at *4 (E.D. Pa. Aug. 22,

2001) ("Where a parent company constitutes one hundred percent of the stockholders of the

subsidiary, it is to be expected that there will be directors which are common to the boards of

both.  Moreover, it is a well established principle of corporate law that directors and officers

holding positions with a parent and its subsidiary can and do 'change hats' to represent the two

corporations separately, despite their common ownership." (cleaned up)); *In re Enterprise*, 735

F. Supp. 2d at 322–23 ("[T]he sharing by the corporations of directors and the ownership by

defendant parent of one-hundred percent of ERAC-Pittsburgh's stock do not implicate [sic] that

defendant parent controlled the subsidiary to the extent necessary to find that ERAC-Pittsburgh

is an alter ego of the parent.  A degree of control naturally flows from these aspects of the parent-

subsidiary relationship, but this incidental control does not rise to the level required to permit the

exercise of jurisdiction over the parent.").

Moreover, Plaintiffs do not present any evidence that CSOKI and CSPA have any *other*

officers or directors in common, so the Court concludes that while this factor weighs in favor of

finding alter ego, it should be given minimal weight.  As illustrated in Tables 1 and 2 below,

CSOKI only has two board members, Dane Scism and Margaret Scism, neither of whom serve

on the board of CSPA or serve in any officer capacity for CSPA.  (Doc. No. 147-2 at ¶¶ 27, 30.)

CSPA has a separate Board of Managers, which consists of James Thome and White.  (*Id.* at

¶ 29.)  And CSPA's only officers are White, Reese Thomas, Joel Thomas Lucas, and Raymond

Yingling Lucas, IV.  (*Id.* at ¶ 33.)  Neither Thomas, Joel Lucas, or Raymond Lucas are officers

or directors of CSOKI.  (*Id.* at ¶¶ 28–30, 33.)  In sum, Pamela White is the only overlapping

officer of CSOKI and CSPA, and there are no overlapping Board members.

**Table 1**

| CSOKI Board | CSPA Board | CSOKI Officers | CSPA Officers |
|---|---|---|---|
| Dane Scism | James Thome | Dane Scism (Chairman) | Pamela White (President, Secretary, & Treasurer) |
| Margaret Scism | Pamela White | Margaret Scism (President) | Reese Thomas (VP) |
| | | Pamela White (CFO, VP, & Secretary) | Joel Thomas Lucas (VP) |
| | | | Raymond Yingling Lucas, IV (VP) |

Plaintiffs' reliance on *In re Latex Gloves Products Liability Litigation* is too heavy handed.  (*See* Doc. No. 142 at p. 12 ("As in *In re Latex Gloves*, 'the nearly complete congruence of the entities' demonstrates CSOKI's control over its subsidiaries.").)  In *In re Latex Gloves*, Allegiance Corporation ("AC") owned 100 percent of the stock in Allegiance Healthcare Corporation ("AHC") and Allegiance Healthcare International Inc. ("AHII").  No. MDL 1148, 2001 WL 964105, at *1 (E.D. Pa. Aug. 22, 2001).  AHC and AHII in turn had their own subsidiaries that manufactured latex gloves and sold them to AHC for marketing and distribution.  *Id.*  The plaintiffs (medical and hospital professionals who allegedly developed toxic reactions from latex gloves) sued AC and AHC.[4]  *Id.*  AHC did not challenge personal jurisdiction, but its parent company, AC, did, arguing that it did not have sufficient contacts with Pennsylvania to be subject to jurisdiction there.  *Id.*

The court determined that it enjoyed personal jurisdiction over AC under the alter ego theory.  *Id.* at *6.  In its analysis of the second factor, the court found that AC and its subsidiaries

---

[4] The plaintiffs in *In re Latex Gloves* did not name AHII as a defendant.

shared common directors and officers, emphasizing that there was "nearly complete congruence of the entities." *Id.* at *4. There, Lester Knight, Joseph Damico, and William Feather served on the board of directors of AHC. *Id.* At the same time, Knight was the CEO of AC and chairman of its board of directors; Damico was the president and COO of AC, as well as a director; and Feather was the senior vice president, general counsel, and secretary of AC, as well as a director. *Id.* In other words, there was substantial overlap between the parent and subsidiary boards, as Knight, Damico, and Feather were each directors of AC *and* AHC. That is distinguishable from this case, where *no* individual serves on both the CSOKI and CSPA boards, and White is the *only* individual who is an officer of both entities. *See Clark v. Matsushita Elec. Indus. Co., Ltd.*, 811 F. Supp. 1061, 1068 (M.D. Pa. 1993) (finding no alter ego jurisdiction where one officer of the parent also sat on the Board of Directors of the subsidiary).

Plaintiffs also cite to an overlap of officers and directors between Defendants and CSSG and CSMG. (*See* Doc. No. 142 at p. 12.) As illustrated in Table 2, CSOKI does not share any board members with its subsidiaries. And, as illustrated in Table 3, White is the only individual who serves as an officer for all four entities (CSOKI, CSPA, CSMG, and CSSG). The Court recognizes that there is some overlap between the CSPA, CSSG, and CSMG Boards and the CSPA, CSSG, and CSMG officers; however, none of these are identical to one another and, again, none of these overlap with CSOKI's directors or officers, other than White (and Dane Scism, who operationally serves as CEO of CSMG).[5]

---

[5] In addressing the second factor of the alter ego test—whether the parent and subsidiary share common directors or officers—Plaintiffs also raise the fact that CSOKI and CSPA share common legal representation in this litigation. (Doc. No. 142 at p. 13.) Although the Court does not necessarily consider it as part of its analysis of the second factor, the Court agrees that shared legal representation is a relevant consideration. *See Genesis Bio Pharma., Inc. v. Chiron Corp.*, 27 F. App'x 94, 98 (3d Cir. 2002) (noting that the fact that the parent and subsidiary "share[d] the same legal counsel in this litigation" was evidence that the parent dominated the subsidiary); *Gasbarre Prods., Inc. v. Diamond Auto. Grp. Fla., Inc.*, Civil Action No. 3:16-53, 2017 WL 1102652, at *5 (W.D. Pa. Mar. 23, 2017) ("Also a relevant

**Table 2**

| CSOKI Board | CSPA Board | CSSG Board | CSMG Board |
|---|---|---|---|
| Dane Scism | James Thome | Reese Thomas | Elizabeth Melloy |
| Margaret Scism | Pamela White | Pamela White | James Thome |
| | | | Pamela White |

**Table 3**

| CSOKI Officers | CSPA Officers | CSSG Officers | CSMG Officers |
|---|---|---|---|
| Dane Scism (Chairman) | Pamela White (President, Secretary, & Treasurer) | Pamela White (President, Secretary, & Treasurer) | Pamela White (President, Secretary, & Treasurer; and operationally serves as CFO) |
| Margaret Scism (President) | Reese Thomas (VP) | Reese Thomas (VP) | Elizabeth Melloy (VP) |
| Pamela White (CFO, VP, & Secretary) | Joel Thomas Lucas (VP) | James Thome (operationally serves as COO, not an elected officer) | Reese Thomas (VP) |
| | Raymond Yingling Lucas, IV (VP) | | James Thome (operationally serves as COO, not an elected officer) |
| | | | Dane Scism (operationally serves as CEO, not an elected officer) |

---

consideration is the fact that both Defendants are represented by the same attorneys.").  However, without more, shared legal representation does not automatically show the requisite level of control needed to establish alter ego jurisdiction over CSOKI.  *See Planned Parenthood of Kan. v. Andersen*, 882 F.3d 1205, 1235 (10th Cir. 2018) ("Kansas states that PPFA's affiliates aggregate their finances, share executives, and share legal counsel . . . But these factors do nothing to show that PPFA exercises control over its affiliates' daily operations.").

***Factors 3 and 4***.  Next, viewing all of the evidence in the light most favorable to

Plaintiffs, the Court finds that there is at least some evidence that CSOKI and CSPA have a

common marketing image and use a common trademark or logo.  Pamela White, CSOKI's

corporate designee, testified that CSOKI does not have a logo or trademark.  (*See* Doc. No. 142-

5 at 155:13–14; *see also id.* at 156:23–157:6 ("Q: Is it your testimony that [CSOKI] does not use

the same logo that we've described earlier today in the other exhibits in any capacity or any use?

A: That's correct.  Because, again, [CSOKI] has no business operations."); Doc. No. 147-2 at

¶ 24 ("As a holding company, CSOKI does not use any brand names or logos in marketing,

advertising, or recruitment materials.  CSOKI also does not maintain or control the use of any

logos or branding.").)  However, other evidence in the record undercuts any assertion that

CSOKI is not in any way associated with the Cellular Sales logo or Cellular Sales brand name.

For example, on both Dane Scism and White's LinkedIn pages, the Cellular Sales logo appears.

(Doc. No. 142-9 at p. 2; Doc. No. 142-10 at p. 2.)  White testified that the Cellular Sales logo

appears on each profile because they are both associated with *CSOKI*:  Scism as the Chairman

and CEO and White as the CFO, Vice President, and Secretary.[6]  (Doc. No. 142-5 at 76:15–

77:17.)  That same Cellular Sales logo appears on the general LinkedIn page for "Cellular

Sales," which CSMG runs. (*Compare* Doc. No. 142-14 at p. 2 *with* Doc. No. 142-9 at p. 2 &

Doc. No. 142-10 at p. 2; *see also* Doc. No. 142-5 at 78:14–16, Doc. No. 147-2 at ¶ 8.)  Although

Plaintiffs did not present evidence that CSPA uses the same Cellular Sales logo, the Court infers

this from the fact that CSPA is only permitted to use Cellular Sales logos that CSMG creates,

---

[6] The Court recognizes that these are Scism and White's personal LinkedIn pages.  However, given these particular individuals' status in CSOKI, and viewing the evidence in the light most favorable to Plaintiffs, the Court finds the LinkedIn pages relevant and considers them here accordingly.

including the common logo featured on other exhibits shown to White in the deposition and provided to the Court as exhibits.  (*See* Doc. No. 147-2 at ¶ 8 ("In connection with its marketing function, CSMG creates, provides, and maintains the rights to the logos used by CSPA."); *see also* Doc. No. 142-5 at 156:3–20 ("Q: So is it your testimony that [CSMG] allows for other subsidiaries, including [CSPA], to use the common logo similar to the one that you've seen today?  A: That's correct[.]"), 159:1–6 ("[CSMG], again, maintains and creates all the logos for the LLCs and it's the responsibility of [CSPA] to use those logos created by the management group."), 167:8–15 ("Q: And what would happen if an individual subsidiary [like CSPA] were to use an alternative logo or marketing image that hadn't been approved by [CSMG] or any other Cellular Sales entity?  A: Well, once [CSMG] becomes aware of it, they would pull it out.").)

Moreover, the brand name "Cellular Sales" is clearly used interchangeably to refer to different entities within the family, including CSOKI and CSPA.  According to White's own testimony, "Cellular Sales" was used to refer to CSOKI on her and Dane Scism's LinkedIn pages (*see* Doc. No. 142-5 at 76:15–77:17), but "Cellular Sales" referred to CSPA in a job posting for a sales consultant job position in Pennsylvania (*see* Doc. No. 142-5 at 82:20–85:6 ("Q: If you scroll down, who do you understand the term 'Cellular Sales' to be referring to?  A: This particular document, obviously, is a job posting for a position in Pennsylvania.  Q: So who do you understand Cellular Sales to be?  . . . A: It's [CSPA].  Q: And how do you know that?  A: Because of the location.  Q: . . . So it's your representation that because this document is targeted towards a sales consultant job in Pennsylvania that Cellular Sales referred to [CSPA]?  A: Yeah. Q: Is there any other basis for your understanding for who Cellular Sales is in this instance?  A: No, to me, it's clear it was [CSPA], because that's the location of the job posting.").)[7]

---

[7] Notably, the job posting also states, "Since opening our doors in 1993, Cellular Sales has evolved into what is now the wireless industry's most respected retail channel for Verizon Wireless."  (*Id.* at 85:7–

Defendants' position—that the onus is on the individual reading the document to infer based on the details of that document which entity "Cellular Sales" refers to—borders on absurd. (*See id.*) Elsewhere, White testified that in a social media post commemorating Cellular Sales's 25th anniversary, Cellular Sales referred to "the Cellular Sales entity," meaning "the LLCs and the consolidation of the holding company of Cellular Sales." (*Id.* at 142:5–143:2.) Taken together, this demonstrates that CSPA and CSOKI are both referred to as "Cellular Sales" and share the same brand name.[8]

*Factors 5 and 7*. Next, CSOKI and CSPA do not share employees. As a holding company, CSOKI does not have any employees. (Doc. No. 147-2 at ¶ 3; *see also id.* at ¶ 22; Doc. No. 142-5 at 38:16–22.) *See Lapine*, No. 5:15-cv-642, 2016 WL 3959081, at *5 (E.D. Pa. July 22, 2016) ("The fifth and seventh factors are certainly not satisfied because Materion Corporation does not have any employees.").

CSPA's operations in Pennsylvania are divided into two markets—the Western Pennsylvania Market and the Eastern Pennsylvania Market. (Doc. No. 147-2 at ¶ 35.) The

---

86:2.) White continued to maintain that Cellular Sales referred to CSPA, despite the fact that CSPA *did not exist* in 1993, and CSOKI was founded in 1993.

[8] In our prior opinion, in which the Court held that Plaintiffs had not established personal jurisdiction over CSOKI, we ruled that Deardorff's FLSA and Pennsylvania Minimum Wage Act claims "are entirely untethered from Internet sales or customers' engagement with CSOKI's website" and that "Deardorff fail[ed] to argue that she applied for her sales position through the website, nor is there any other basis to find a nexus between her claims and the website." *Deardorff*, 2020 WL 5017522, at *6. In their supplemental memorandum, Plaintiffs assert that Deardorff applied for a sales representative position via the Cellular Sales website. (*See* Doc. No. 142 at p. 15 n.4.) However, this still does not establish that personal jurisdiction over CSOKI is proper because Plaintiffs have not shown any connection between Deardorff's job application and her FLSA claim that she was denied overtime. *See Reynolds*, 2020 WL 953279, at *4 ("The Turning Point website does not subject any out-of-state entity to specific or general personal jurisdiction in Pennsylvania . . . . Postings for job openings and Ms. Reynolds [sic] claims both relate to the Turning Point human relations function, but they are not the same conduct, and they are not so related as to give rise to specific personal jurisdiction because Ms. Reynolds' alleged harm does not flow from Turning Point's hiring procedures. *Nothing in the record suggests that Turning Point's website has any connection to its pay practices*." (emphasis added)).

regional directors for each market are responsible for overseeing the operations in their respective markets.  (*Id.*)  Joel Thomas Lucas and Raymond Yingling Lucas, IV are the regional directors for the Eastern Market (*id.*) and George Argeras and Nick Naveroski are the regional directors for the Western Market (*id.* at ¶ 36).  None of these individuals is an employee of CSOKI.  (*Id.* at ¶ 37.)  Rather, they are employed through CSPA's leasing arrangement with CSSG.  (*Id.* at ¶¶ 35–36.)[9]

Plaintiffs point to White's deposition testimony in which she testified that, in addition to these regional directors, CSSG employees "assist in managing the operations of [CSPA]" (*see* Doc. No. 142 at pp. 17–18; Doc. No. 142-5 at 50:25–51:7); however, nowhere does White testify that those individuals were also employees of CSOKI, and White's declaration refutes any conjecture to the contrary.  (Doc. No. 142-2 at ¶ 38 (stating that "through CSPA's leasing arrangement with CSSG, CSPA employs numerous back office employees and managerial employees to assist CSPA with CSPA's day-to-day operations" and that "[t]hey are not employed by and do not work for . . . CSOKI").)  Plaintiffs argue that CSOKI uses CSSG and CSMG employees to control CSPA.  (*See* Doc. No. 142 at p. 17.)  But, critically, the fifth and seventh factors of the alter ego test pertain to whether *CSOKI and CSPA* share employees and personnel, and the answer to that question is "no."

*Factor 6*.  As Plaintiffs appear to concede (*see generally* Doc. No. 142 (declining to address the sixth factor)), CSOKI and CSPA do not share an integrated sales system.  CSOKI does not market or sell wireless services, cellular phones, or other products or services; it does

---

[9] White also testified that as President of CSPA, she is involved in directing CSPA's operations.  (Doc. No. 142-5 at 49:25–50:16.)  White is not an employee of CSOKI; she is an employee of CSSG. (*Id.* at 33:2–11, 41:13–16.)  However, as noted, she is an officer of CSOKI (CFO, Vice President, and Secretary).

not conduct any sales or distribute any products.  (Doc. No. 147 at ¶ 3; Doc. No. 142-5 at 134:5–9.)  Therefore, this factor weighs against a finding of alter ego jurisdiction.

*Factor 8*.  Turning to the next factor, the Court finds that because CSOKI is a holding company, CSPA does not perform business functions that CSOKI would ordinarily have to handle itself.  *See In re Enterprise*, 735 F. Supp. 2d at 324 ("With respect to whether defendant parent would have to perform the business functions of the operating subsidiaries if not for their existence, the court notes that in the case of holding companies, the subsidiary is not performing a function that the parent would otherwise have had to perform itself (the holding company could simply hold another type of subsidiary)." (cleaned up)); *Lapine*, 2016 WL 3959081, at *5 (same); *see also Lutz*, 376 F. Supp. 3d at 471 ("These companies' functions are also not normal functions that Rakuten would perform, *as a holding company*.").  Thus, this factor weighs against finding that CSPA is an alter ego of CSOKI.[10]

*Factors 9 and 10*.  Next, the Court finds that CSPA does not act as the marketing arm of or an exclusive distributor for CSOKI.  Rather, CSMG is responsible for the marketing of all Cellular Sales subsidiaries.  (*See, e.g.*, Doc. No. 142-5 at 159:1–6 ("[CSMG], again, maintains and creates all the logos for the LLCs and it's the responsibility of [CSPA] to use those logos created by the management group.").)  And, finally, there is no evidence in the record that CSOKI controls or provides instructions to CSPA's officers and directors.  Plaintiffs cite White's testimony with respect to employee handbooks, claiming that it shows CSOKI has directed company-wide policies to be carried out.  (*See* Doc. No. 142 at p. 19.)  White testified that CSMG oversees Human Resources function of all of the Cellular Sales subsidiaries (Doc. No.

---

[10] Plaintiffs also appear to concede that this factor does not support alter ego jurisdiction, as they do not address it in their brief.  (*See* Doc. No. 142.)

142-5 at 100:18–21) and that the HR team drafts employment policies and handbooks, which are largely uniform across Cellular Sales's subsidiaries (*id.* at 104:13–17, 105:2–8). However, Plaintiffs do not point to any—and the Court has not found—testimony indicating that CSOKI played a role in the implementation of these company-wide policies or directed CSMG to create them. In addition, White testified that regional directors may modify the handbook within their particular market (e.g., dress codes, attendance requirements, scheduling etc.). (*Id.* at 168:25–170:4.)[11] And even if Plaintiffs did show that CSOKI directed these policies, they do not explain how the employee handbooks transcend the bounds of the level of supervision present in typical parent-subsidiary relationship. *See In re Latex Gloves*, 2001 WL 964105, at *3 ("Appropriate parental involvement includes monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures."); *Reynolds*, 2020 WL 953279, at *3 (same); *In re Chocolate*, 674 F. Supp. 2d at 598 (explaining that "[m]ore intrusive control is necessary.").

***

In sum, though some of the alter ego factors are satisfied—CSOKI owns one hundred percent of CSPA's stock, there is at least one common officer between CSPA and CSOKI, and there is a common trademark or logo and marketing image—these factors fail to sufficiently establish that CSOKI exercises control over CSPA's daily operations. *See In re Latex Gloves*, 2001 WL 964105, at *4 ("[M]ere ownership of a subsidiary, even one hundred percent

---

[11] Plaintiffs assert that Defendants "refus[ed] to cooperate in the written discovery process." (Doc. No. 142 at p. 19; *see also* Doc. No. 142-1 (Brooks Decl.).) The Court finds Defendants' failure to object to the 30(b)(6) deposition topics until just days before the deposition finally occurred to be very troublesome. Nonetheless, the time to have addressed Defendants' refusal to cooperate in the discovery process would have been the time it arose. But Plaintiffs never raised these concerns—or any other issues—to the Court at that time, or any other time *during* jurisdictional discovery. Nor do Plaintiffs point to any question that White refused to answer during her deposition.

15

ownership, is not sufficient to assert that a subsidiary is the alter-ego or agent of its parent corporation." (cleaned up)); *Baker v. LivaNova PLC*, 210 F. Supp. 3d 642, 650 (M.D. Pa. 2016) (same); *see also In re Enterprise*, 735 F. Supp. 2d at 322–23 (same); *Bell v. Fairmont Raffles Hotel Int'l*, Civil Action No. 12-757, 2013 WL 6175717, at \*4, \*6 (W.D. Pa. Nov. 25, 2013) (holding that the fact that four officers or directors of the parent, FRHI, held various roles within different Fairmont entities, did not give "any indication that the relationship between FHRI and the other Fairmont entities 'is greater than normally associated with common ownership and directorship' or that FHRI 'controls the day-to-day operations of the subsidiary such that the subsidiary can be said to be a mere department'" (citations omitted)); *Lapine*, 2016 WL 3959081, at \*2, \*5 (finding that the second factor of the alter ego test was satisfied where the parent and the subsidiary shared five officers and directors in common, but that ultimately the plaintiff did not present evidence that the parent exercised control over the subsidiary and therefore could not be considered an alter ego of the subsidiary); *Baker*, 210 F. Supp. 3d at 650–51 (holding that although the "three companies shared the unified brand of 'LivaNova,' as well as a common website and logo," the evidence failed to demonstrate that the parent actually controlled the daily affairs of its subsidiaries); *Reynolds*, 2020 WL 953279, at \*3 ("[T]he fact that a company is portrayed as a single brand to the public . . . does not demonstrate the necessary control by defendant parent subsidiaries." (cleaned up)).

Throughout their memorandum, Plaintiffs baldly state that CSOKI directs CSSG and CSMG and that through CSMG and CSSG, CSOKI controls CSPA. (*See, e.g.*, Doc. No. 142 at p. 18 ("The record evidence demonstrates that the vast majority of operational, managerial, financial and HR functions are not carried out by the regional subsidiaries themselves [like CSPA], but instead are carried out by employees of CSSG and CSMG at CSOKI's direction.").)

16

However, Plaintiffs have not *shown* that CSOKI directs CSSG and CSMG. Plaintiffs attempt to support their argument that CSOKI directs CSSG and CSMG by maintaining that "CSOKI uses CSSG to centralize and carry out the employment and payroll processes (i.e., hiring, termination, execution of employment contracts) for all of CSOKI's subsidiaries, including [CSPA]" and that "CSOKI directs CSMG to manage the operations of all subsidiaries, including the Human Resources, IT, and marketing functions on CSOKI's behalf." (Doc. No. 142 at p. 10.) But Plaintiffs' citations to the record do not support those propositions. First, White does not state that CSOKI uses CSSG to centralize and carry out employment processes; rather, she simply explains what CSSG's function is. (*See* Doc. No. 142-5 at 50:25–51:7 ("Q: Okay. Are there other employees who assist in managing the operations of [CSPA] who are not located in the market? A: They are not employees of [CSPA.] Q: Who are they employees of? A: [CSSG].").) Second, neither of Plaintiffs' citations state that CSOKI directs CSMG; rather, they show what CSMG's role is and what White's responsibilities are with respect to CSMG, as she is the CFO of that entity as well. (*See* Doc. No. 142-5 at 42:17–43:1 ("Q: What are your responsibilities associated with your role as chief financial officer for [CSOKI]? A: Again, [CSOKI] is a holding company, so my responsibility for [CSMG] is to over – or to perform that function for all of the subsidiaries that roll up under the holding company."); Doc. No. 142-8 at p. 2 ("[CSMG] is an authorized Verizon Wireless . . . retailer. Each Cellular Sales retail store is owned and operated by an affiliated company of CSMG organized in the state in which the store is located.").)[12]

　　　　Ultimately, Plaintiffs are unable to rebut White's sworn declaration, averring that CSOKI

---

[12] And even if CSOKI did oversee the human resources, IT, and marketing functions of CSPA, that would not evidence the day-to-day control necessary to establish alter ego jurisdiction. *See, e.g.*, *Reynolds*, 2020 WL 953279, at *3 ("[T]he fact that District Managers supervise the individual restaurants or that TPHC maintains payroll is immaterial because the 'level of control necessary to substantiate an alter ego

does not direct or control CSSG or CSMG.  (*See* Doc. No. 142-7 at ¶ 14 ("CSOKI does not direct, manage, participate or oversee CSMG's services or functions, including its human resources functions, for CSPA or any other entity . . . . CSOKI does not provide any directives or instructions to CSMG's managerial staff or personnel."), ¶ 20 ("CSOKI also does not oversee, manage, direct, or control CSSG's leasing operations[.]"), ¶ 22 ("[S]ignificant decisions by CSSG, CSPA, and CSMG do not have to be approved by CSOKI."), ¶ 45 ("CSOKI does not require or expect CSPA, CSMG, or CSSG . . . to notify CSOKI prior to using any brand name or logo.").)  *See, e.g.*, *Metcalfe*, 566 at 330.

Plaintiffs also attempt to rely on the fact that in White's capacity as CFO of CSOKI, she compiles consolidated financial statements of CSOKI's subsidiaries, including CSPA, to support alter ego jurisdiction.  (*See* Doc. No. 142 at pp. 10–11.)  White testified that because CSOKI is a holding company, the financial statements of the LLCs, such as CSPA, are consolidated under the holding company for tax return and financial reporting purposes.  (Doc. No. 142-5 at 119:21–121:6.)  But this does not establish that CSOKI exercised daily control over CSPA either.  *See, e.g.*, *Reynolds*, 2020 WL 953279, at *1, *4 (noting that the parent, TPHC, files a consolidated income tax return for all of the entities but not considering that fact in its analysis and ultimately holding that there was no alter ego jurisdiction as the plaintiffs had not presented enough evidence "to overcome the presumption that wholly-owned subsidiaries are separate and distinct

---

relationship must exceed the usual supervision that a parent exercises over a subsidiary.'" (citations omitted)); *In re Chocolate*, 674 F. Supp. 3d at 599–600 ("As the controlling shareholder of Mars Canada, Mars Global is entitled to ordain Mars Canada's officers and directors, influence executive compensation, approve budgets, gather information about corporate performance, and receive distributions of subsidiary profits.  These activities typify standard parent-subsidiary interactions and do not reflect daily, operational control that is *sine qua non* of an alter ego relationship.  Issuance of group-wide accounting, finance, and sales protocols through the Finance and Recurring Reports Manuals likewise does not establish an alter ego relationship.").

from their parent companies"); *see also Clark v. Matsushita Elec. Indus., Ltd.*, 811 F. Supp. 1061, 1069 (M.D. Pa. 1993) ("Finally, there is no evidence that the independence of the separate corporate entities was disregarded. . . .  The court finds that the only evidence arguably supporting this proposition, MEI's lumping together of financial information for MEI and its subsidiaries in its annual report, has little, if any, probative value.").

In sum, the Court concludes that CSPA is not the alter ego of CSOKI, and that the evidence Plaintiffs point to "does not reveal an extraordinary level of control of [CSOKI] over [CSPA], other than the kind of control associated with parent-subsidiary relationships."  *In re Enterprise*, 735 F. Supp. 2d at 324 (holding that the subsidiary was not an alter ego of its parent, despite the fact that the parent owned 100% of the subsidiary's stock, there were common directors, a common marketing image and a joint use of trademarked logos, and the use of an integrated sales system, because none of these showed that the parent exercised "control over the internal workings or day-to-day operations" of the subsidiary); *Reynolds*, 2020 WL 953279, at *3–4 (finding that the subsidiary was not the alter ego of its parent where the entities had common ownership, common directors and officers, and common use of a trademark or logo, reasoning that although the plaintiff "demonstrated that the [] entities operate as a single brand with common corporate control," that was "not enough to overcome the presumption that wholly-owned subsidiaries are separate and distinct from their parent companies").  Because alter ego jurisdiction is not proper, this Court grants CSOKI's motion to dismiss for lack of personal jurisdiction.

### B.    *Motion to Amend*

Next, the Court turns to Plaintiffs' motion for leave to amend their complaint to add CSSG and CSMG as Defendants.

1.  <u>Rule 15(c)</u>

Plaintiffs argue that they may amend their complaint to add CSMG and CSSG as Defendants under the relation back doctrine and therefore the expired statute of limitations for their FLSA claims does not bar the amendment.  (Doc. No. 146-1 at pp. 9–10.)

Under Rule of Federal Procedure 15(c), an amendment naming a new party will relate back to the original complaint if the following three conditions are satisfied:  (1) the claim in the amending pleading arises out of the same conduct, transaction, or occurrence set forth in the original pleading; (2) within 120 days of the institution of the action, the party to be brought in by amendment received notice of the action such "that the party will not be prejudiced in maintaining a defense on the merits"; and (3) within 120 days of the institution of the action, the party to be brought in by amendment knew or should have known that "but for a mistake concerning the identity of the proper party" the action would have been brought against that party.  Fed. R. Civ. P. 15(c)(1)(C); *Arthur v. Maersk, Inc.*, 434 F.3d 196, 207 (3d Cir. 2006); *see also Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 541 (2010) ("Rule 15(c) of the Federal Rules of Civil Procedure governs when an amended pleading 'relates back' to the date of a timely filed pleading and is thus timely even though to was filed outside an applicable statute of limitations.").

Here, the first prerequisite is met because the FLSA claims against the new Defendants, CSMG and CSSG, arise out of the same set of facts or occurrence set forth in the original complaint—namely, that Defendants employed Plaintiffs, Plaintiffs worked overtime, and Plaintiffs were not paid for that overtime.  *See Gonzalez-Marcano v. U.S. Airways Grp., Inc.*, Civil Action No. 13-3714, 2014 WL 413932, at *5 (E.D. Pa. Jan. 31, 2014) ("Rule 15(c)'s first requirement is clearly met here.  The proposed amended complaint is identical to the Complaint,

except for the named defendants.  Indeed, the amendment does not add new facts or causes of action.  There can be no serious debate that the amendment arises from the same transaction or occurrence.").

The second prerequisite is also satisfied because notice of the lawsuit may be imputed to CSSG and CSMG under the identity of interest theory.  "[U]nder the identity of interest princip[le], notice may be imputed to parties . . . when the original and added parties are so closely related in business or other activities that it is fair to presume the added parties learned of the institution of the action shortly after it was commenced."  *Id.* at *5 (cleaned up).  "The identity of interest principle is often applied where the original and added parties are a parent corporation and its wholly owned subsidiary."  *Id.*; *see also Johnson v. Geico Cas. Co.*, 673 F. Supp. 2d 244, 249 (D. Del. 2009) ("An identity of interest generally exists in a parent-subsidiary context.").  Courts have also imputed notice under the identity of interest principle where the entities share the same registered agent, share corporate officers, and/or share the same corporate address.  *See, e.g.*, *Gonzalez*, 2014 WL 413932, at *5; *Dunbar v. Montgomery County*, Civil Action No. DKC 20-0738, 2020 WL 7319276, at *4 (D. Md. Dec. 11, 2020); *Dunhem v. Suntrust Banks, Inc.*, Civil Action No. AW-04-1016, 2005 WL 8174721, at *1 (D. Md. Jan. 25, 2005).

Here, the Court finds that CSSG and CSMG share an identity of interest with CSOKI, and that CSOKI's notice[13] may be imputed to CSSG and CSMG for purposes of Rule 15(c)(2), because CSSG and CSMG are wholly owned subsidiaries of CSOKI (*see* Doc. No. 65-3 at ¶ 13; Doc. No. 146-5 at 134:1–4, Doc. No. 146-4 at ¶¶ 23, 25); all three entities share the same registered agent (White) (*see* Doc. No. 146-4 at ¶¶ 19, 22, 24); each entity maintains its principal

---

[13] CSOKI waived service on September 10, 2019.  (Doc. No. 48.)  Therefore, it had notice of the lawsuit within 120 days of the complaint being filed.  (*See* Doc. No. 1 (complaint filed on June 18, 2019).)

place of business at the same address (9040 Executive Park Drive, Knoxville, TN) (*see id.*); and each entity shares at least some overlap in corporate officers (*see* Doc. No. 65-3 at ¶¶ 2–3 (indicating that White is the CFO, Vice President, and Secretary of CSOKI, as well as the President, Treasurer, and Secretary of all of the Cellular Sales subsidiaries, which would include CSSG and CSMG)). *See Gonzalez*, 2014 WL 413932, at *5 ("Here, the original defendant, U.S. Airways Group, is the parent corporation of the proposed additional defendant, U.S. Airways, Inc., the wholly-owned subsidiary. In addition, the Plaintiff claims that the two corporations share the same corporate address in Arizona. On these facts, the identity of interest princip[le] allows us to impute any notice that U.S. Airways Group received regarding this action to U.S. Airways, Inc. because, as parent and subsidiary, they are so closely related in business that we can presume that if U.S. Airways Group knew about the action, so did U.S. Airways, Inc."); *see also Dunbar*, 2020 WL 7319276, at *4 ("Given that the entities are structured as parent and subsidiary corporations, share multiple corporate officers in common, share a resident agent for service of process, and do not distinguish themselves in their public discourse, the entities appear to be 'closely related and functioning business entities.' Taken together, this collective information shows that an identity of interests exists between KPIC, KFHP, and KFHPMAS. Thus, KPIC's notice of the lawsuit within the Rule 4(m) period can be imputed to KFHP and KFHPMAS in satisfaction of Rule 15(c)(1)(C)(i)."); *Dunhem*, 2005 WL 8174721, at *1 (finding an identity of interest between Suntrust Bank and Suntrust Bank, Inc. and that relation back was proper under Rule 15(c), where Suntrust Bank was a wholly owned subsidiary of Suntrust Banks, Inc., both entities utilized the same resident agent, and both entities were represented by the same counsel). *Contra Markhorst v. Ridgid, Inc.*, 480 F. Supp. 2d 813, 817 (E.D. Pa. 2007) (holding that the plaintiff failed to show constructive notice through the identity of interest method,

reasoning that the two corporations, Ridgid and One World, were "not parents or subsidiaries of one another," did "not share office space," and did not "share any officers, directors, or any other personnel").

Last, Plaintiffs must show that within 120 days of the filing of the original complaint, CSSG and CSMG "knew or should have known that, but for a mistake made by [Plaintiffs] concerning the newly named part[ies'] identit[ies], the action would have originally been brought against [them]." Fed. R. Civ. P. 15(c)(1)(C); *see also Krupski*, 560 U.S. at 541. "This requirement ensures that the proposed additional party knew or should have known all along that joinder was a distinct possibility." *Gonzalez-Marcano*, 2014 WL 413932, at *6 (quoting *Taliferro v. Costello*, 467 F. Supp. 33, 36 (E.D. Pa. 1979)). As the Supreme Court has instructed, "Rule 15(c)(1)(C)(ii) asks what the prospective *defendant* knew or should have known during the Rule 4(m) period, not what the *plaintiff* knew or should have known at the time of filing her original complaint." *Krupski*, 560 U.S. at 548; *see also id.* at 541 (explaining that the inquiry "depends on what the party to be added knew or should have known, not on the amended party's knowledge or its timeliness in seeking to amend the pleading").

The Court finds that the third requirement is also satisfied.[14] CSSG and CSMG should

---

[14] Elsewhere in their opposition, Defendants argue that Plaintiffs should not be permitted to add CSSG as a party because Plaintiffs knew at the time of filing the complaint that CSSG existed. (Doc. No. 148 at p. 125.) However, Plaintiffs' knowledge—and the timing of Plaintiffs' knowledge—does not affect our Rule 15(c) analysis. *See Krupski*, 560 U.S. at 548–49 ("Information in the plaintiff's possession is relevant only if it bears on the defendant's understanding of whether the plaintiff made a mistake regarding the proper party's identity. For purposes of that inquiry, it would be error to conflate knowledge of a party's existence with the absence of mistake. . . . That a plaintiff knows of a party's existence does not preclude her from making a mistake with respect to that party's identity. A plaintiff may know that a prospective defendant—call him party A—exists, while erroneously believing him to have the status of party B. Similarly, a plaintiff may know generally what party A does while misunderstanding the roles that party A and party B played in the conduct, transaction, or occurrence giving rise to her claim. If the plaintiff sues party B instead of party A under these circumstances, she has made a mistake concerning the proper party's identity notwithstanding her knowledge of the existence of both parties.").

have known at the time Plaintiffs filed the complaint that Plaintiffs had made a mistake in naming CSOKI instead of them.  First, CSOKI does not have any employees and as of January 1, 2018, the Cellular Sales subsidiaries, including CSNC and CSPA, began employing their sales representatives through a leasing arrangement with CSSG.  (*See* Doc. No. 65-3 at ¶¶ 4, 13; Doc. No. 146-5 at 38:16–22).  To that end, Chapman's employment agreement explicitly identifies CSSG as a party to the contract, and CSSG is the only Cellular Sales entity listed on Chapman's pay stub from July 2018.  (*See* Doc. No. 65-3, Ex. B-12 at p. 139 ("This **DEALER COMPENSATION AGREEMENT** . . . is made and entered into effective as of Employee's signature date . . . by and between **CELLULAR SALES SERVICES GROUP, LLC** ('Cellular Sales'), and the undersigned employee ('Dealer')."); Doc. No. 142-16 (Chapman's pay stub, which states "Cellular Sales Services Group, LLC" at the bottom, underneath "Company Message").)

In addition, CSMG manages all of the Cellular Sales entities and conducts Human Resources functions for all the entities, including creating employee policies and creating and amending the DCAs,[15] which include provisions concerning payment and record keeping.  (Doc. No. 142-5 at 99:8–20, 100:18–21, 137:21–25; *see also* Doc. No. 142-18.)  And in their original complaint, Plaintiffs alleged that "Sales Representatives work more than 40 hours in a week and Defendants have company-wide pay policies and practices and a time recording system that encourages Sales Representatives to work unscheduled hours that go unrecorded.  Despite Sales Representatives' performance of work during overtime hours, Defendants do not pay Sales Representatives overtime wages."  (Doc. No. 1 at ¶ 3.)  *See Gonzalez-Marcano*, 2014 WL 413932, at *6 ("We also conclude that U.S. Airways, Inc. should have known that it would have

---

[15] CSSG is identified in the DCA, as well as on Chapman's paystubs.

originally been the defendant in this action, but for Plaintiff's mistake: the complaint clearly sets

out that Plaintiff meant to sue the company that owned, operated, controlled, and maintained the

aircraft on which she was allegedly injured, and U.S. Airways, Inc. knew that it, not U.S.

Airways Group, was responsible for the aircraft.  In fact, U.S. Airways, Inc. should have known

that U.S. Airways Group could not have been the proper defendant because it does not even do

business in Puerto Rico.  Thus, U.S. Airways, Inc. should have known . . . that the sole reason

that it was not originally named as a defendant was because Plaintiff misunderstood which U.S.

Airways entity was responsible for the aircraft.").

2. <u>Rule 15(a)</u>

Plaintiffs argue that because all three requirements of Rule 15(c) are met in this case, this

Court need not conduct a Rule 15(a) analysis.  (*See* Doc. No. 149 at p. 6 ("The Supreme Court

and the Third Circuit have established that the Court need not engage Rule 15(a)'s equitable

considerations where the 15(c) factors have been met.").)

Federal Rule of Civil Procedure 15(a) allows a party to "amend its pleading once as a

matter of course within 21 days after serving it, or . . . 21 days after service of a responsive

pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier."

Fed. R. Civ. P. 15(a)(1).  "In all other cases, a party may amend its pleading only with the

opposing party's written consent or the court's leave," which should be freely given "when

justice so requires."  Fed. R. Civ. P. 15(a)(2).  The burden is on the party opposing the

amendment, and the "touchstone of the rule is a showing of prejudice" to the opposing party.

*Price v. Trans Union, LLC*, 737 F. Supp. 2d 276, 279 (E.D. Pa. 2010).  "In the absence of

substantial or undue prejudice, denial [of a motion to amend] must be grounded in bad faith or

dilatory motives, truly undue or unexplained delay, repeated failure to cure deficiency by

amendments previously allowed or futility of amendment." *Heyl & Patterson Int'l, Inc. v. F. D. Rich Hous. of V.I., Inc.*, 663 F.2d 419, 425 (3d Cir. 1981).

In contending that Rule 15(a) is inapplicable here, Plaintiffs misread the governing law. Nowhere in *Krupski v. Costa Crociere S. p. A.* does the Supreme Court state that courts should not consider the Rule 15(a) factors in determining whether to grant leave to amend where the court has already determined that the requirements of Rule 15(c) have been satisfied and relation back is proper. Rather, the Supreme Court held that undue delay in filing an amended complaint—which is an equitable consideration under Rule 15(a)—should not be considered in determining whether an amendment *relates back* under Rule 15(c). 560 U.S. at 552–53. In other words, the Supreme Court cautioned against conflating Rule 15(a) and Rule 15(c) and clarified the scope of the two rules.

In *Krupski*, the Court of Appeals concluded that the plaintiff's amended complaint did not relate back under Rule 15(c) because the plaintiff had unduly delayed in seeking leave to file her amended complaint. *Id.* at 552. The Supreme Court reversed, finding no support for the Court of Appeals' position that "a plaintiff's dilatory conduct can justify the denial of relation back under Rule 15(c)(1)(C)." *Id.* at 552–53 ("The Rule plainly sets forth an exclusive list of requirements for relation back, and the amending party's diligence is not among them. Moreover, the Rule mandates relation back once the Rule's requirements are satisfied; it does not leave the decision whether to grant relation back to the district court's equitable discretion."). In its analysis, the Supreme Court explained the distinction between Rule 15(a) and Rule 15(c):

> The mandatory nature of the inquiry for relation back under Rule 15(c) is particularly striking in contrast to the inquiry under Rule 15(a), which sets forth the circumstances in which a party may amend its pleading before trial. By its terms, Rule 15(a) gives discretion to the district court in deciding whether to grant a motion to amend a pleading to add a party or a claim. . . . We have previously explained that a court may consider a movant's 'undue delay' or 'dilatory motive'

> in deciding whether to grant leave to amend under Rule 15(a).  As the contrast between Rule 15(a) and Rule 15(c) makes clear, however, the speed with which a plaintiff moves to amend her complaint or files an amended complaint after obtaining leave to do so has no bearing on whether the amended complaint relates back.

*Id.* at 553.  Because the Court of Appeals impermissibly considered dilatory motive in conducting its Rule 15(c) analysis, the Supreme Court held that the lower courts erred in denying relation back under Rule 15(c).  *Id.* at 554.

The Third Circuit's holding in *Arthur v. Maersk, Inc.*, 434 F.3d 196, 199 (3d Cir. 2006) is no different.  In *Arthur*, even though all three requirements of Rule 15(c) had been met, the district court "denied relation back based on undue delay."  *Id.* at 203.  The Third Circuit found that by doing so, the district court had erred and failed to recognize the distinction between Rule 15(a) and Rule 15(c).  *Id.* at 202–03 ("Leave to amend under subsection (a) and relation back under subsection (c), while obviously related, are conceptually distinct."); *see also id.* at 203 ("There is no allowance in Rule 15(c) for inquiry into a party's delay in moving for leave to amend.  Such equitable considerations are relevant to whether leave to amend should be granted under Rule 15(a), but do not relate to any of the enumerated conditions of Rule 15(c).  Undue delay is a reason to deny leave to amend but not to deny relation back.").  Like *Krupski*, *Arthur*'s reach is limited; in both cases, the courts denied *relation back* under Rule 15(c) after taking into account equitable considerations that are irrelevant to the *relation back* analysis.

*Krupski* and *Arthur* are inapplicable where, as here, the court finds that the amendments related back under Rule 15(c), *before* turning to the Rule 15(a) factors.  In sum, neither *Krupski* nor *Arthur* prevents us from considering equitable factors at this juncture.  To the contrary, in *Arthur*, the Third Circuit implies that it is proper to consider the Rule 15(a) factors after conducting the relation back inquiry under Rule 15(c).  *See* 434 F.3d at 204 (explaining that it need not reverse the district court if the district court's "findings would support denial of leave to

amend under Rule 15(a)," even though the district court had technically erred by considering undue delay when it denied relation back).

And district courts within this Circuit have explained that it is appropriate to consider the Rule 15(a) factors after determining that the amendments relate back under Rule 15(c). *See, e.g.*, *Altenbach v. Link*, Civil No. 3:14-cv-2431, 2017 WL 583141, at *2 (M.D. Pa. Feb. 13, 2017) ("[E]ven if Plaintiff's amended pleading meets the requirements of Rule 15(c) and would relate back to the date of the original pleading, leave to amend under Rule 15(a) may be denied if the Court determines that amendment would be 'unjust' and leave should not be granted."); *Rinaldi v. United States*, No. 1:13-cv-450, 2019 WL 6328027, at *3 (M.D. Pa. Nov. 26, 2019) (same); *Fennell v. Tacu*, Civil Action No. 20-1157, 2021 WL 2338737, at *2 (W.D. Pa. June 8, 2021) ("Additionally, a court's decision as to whether a new claim relates back to an original complaint is separate from, and entails use of a different standard than, the court's decision as to whether to grant leave to amend.  Therefore, if an amended pleading meets the Rule 15(c) requirements and relates back to the date of the original pleading, a court can still deny leave to amend under Rule 15(a) if it determines that the amendment would be unjust."); *Wine v. EMSA Ltd. P'ship*, 167 F.R.D. 34, 36 (E.D. Pa. 1996) ("Although Rule 15(a) favors a liberal policy for the amendment of pleadings, if a litigant seeks to add a party after the statute of limitations on its claim has run, the essence of Rule 15(a) is not reached, unless the Court finds that the requirements of Federal Rule of Civil Procedure 15(c), which governs the relation back of amendments, have been satisfied."); *see also id.* at 39 ("Having found that the relation back requirements of Rule 15(c) have been satisfied, the Court may now turn to the issue of whether Plaintiff's current motion for leave to amend her complaint should be granted 'in the interests of justice' under Rule 15(a).").

Therefore, we now turn to Defendants' contention that Defendants were unfairly

prejudiced by Plaintiffs undue delay in amending their complaint and that the proposed

amendments are futile.  (Doc. No. 148 at pp. 13–27.)

*Undue Delay*.  "In the Third Circuit, delay alone does not justify denying a motion to

amend.  Rather, it is only where delay becomes undue, placing an unwarranted burden on the

court, or prejudicial, placing an unfair burden on the opposing party, that denial of a motion to

amend is appropriate."  *Synthes, Inc. v. Mathes*, 281 F.R.D. 217, 225 (E.D. Pa. 2012) (cleaned

up); *see also Mullin v. Balicki*, 875 F.3d 140, 151 (3d Cir. 2017) ("While simply delay cannot

justify denying leave to amend by itself, delay that is 'undue'—a delay that is protracted and

unjustified—can place a burden on the court or counterparty, or can indicate a lack of diligence

sufficient to justify a discretionary denial of leave.").  "As there is no presumptive period in

which delay becomes undue, the question of undue delay requires that we focus on the movant's

reasons for not amending sooner while bearing in mind the liberal pleading philosophy of the

federal rules."  *Mullin*, 875 F.3d at 151 (cleaned up).  A plaintiff who moves for leave to amend

must offer a cogent reason for the delay in seeking amendment.  *See Id.* ("[W]e have refused to

overturn denials of motions for leave to amend where the moving party offered no cogent reason

for the delay in seeking the amendment."); *Atl. Holdings Ltd. v. Apollo Metals, Ltd.*, No. 5:16-

cv-06247, 2018 WL 5816906, at *3 (E.D. Pa. Nov. 7, 2018) (same).  "Ultimately, 'the obligation

of the district court is to articulate the imposition or prejudice caused by the delay, and to balance

those concerns against the movant's reasons for delay.'"  *Synthes*, 281 F.R.D. at 225 (quoting

*Coventry v. U.S. Steel Corp.*, 856 F.2d 514, 520 (3d Cir. 1988)).

In their motion, Plaintiffs claim that "[a]t the time of filing [their lawsuit], [they] did not

know of the existence of CSMG or CSSG."  (Doc. No. 146-1 at p. 17.)  As to CSSG, Plaintiffs'

representation is misleading and gives the Court pause, given that CSSG is identified as a party

to Plaintiff Chapman's DCA, dated December 26, 2017 (Doc. No. 65-3, Ex. B-12), and it is the

only Cellular Sales entity listed on one of Chapman's pay stubs from July 2018 (Doc. No. 142-

16).  In addition, it is doubtful that Plaintiffs did not learn of CSSG's involvement in sales

representatives' employment until jurisdictional discovery in late 2020 and early 2021.[16]  (*See*

Doc. No. 65-3, Ex. B-12 (Chapman's 2017 DCA, listing CSSG as a signatory); Doc. No. 65-3 at

¶ 13 (Pamela White's November 5, 2019 declaration stating that as of January 2018, CSNC and

CSPA employed their sales representatives through a leasing arrangement with CSSG).).

Likewise, as Defendants observe (Doc. No. 148 at p. 25 n.6), Plaintiffs' contention that they did

not know of CSMG's existence until jurisdictional discovery is undermined by their own filing,

dated December 6, 2019, which identifies CSMG in an exhibit (Doc. No. 77-1).

Nonetheless, given the precedent in this Circuit, the Court has difficulty finding that the

delay here is undue.  Although Plaintiffs filed their complaint in June 2019, this case is still at the

very early stages of litigation.  Discovery has not yet begun, the Court has not yet issued a

scheduling order, and there have been no motions to certify a class or collective.  The cases

Defendants rely on to support their argument that Plaintiffs unduly delayed involved motions to

amend that occurred at much later stages of the litigation than those present here—i.e, near the

conclusion of discovery or after discovery has been completed.  *See Heraeus Med. GmbH v.*

---

[16] As noted above (*supra* n.1), Plaintiffs' counsel initiated four separate arbitration proceedings on behalf of four individuals who had previously filed Consent to Sue forms in this matter.  (*See* Doc. No. 148-1 at ¶ 6.)  In three of the four arbitrations—all of which were initiated in spring or summer 2020, *before* this Court granted jurisdictional discovery in this case—CSSG was named as a respondent.  (*See id.* at ¶ 8 (explaining that on April 24, 2020, Marcus Hill initiated an arbitration proceeding and specifically named CSSG as a respondent in the proceeding); *id.* (noting that "the AAA [American Arbitration Association] confirmed that the third respondent is CSSG, and Marcus Hill has continued to pursue alleged claims against CSSG in the arbitration proceeding"); *id.* at ¶ 10 (explaining that on June 12, 2020, Patrick McConnon initiated an arbitration proceeding with the AAA and named CSSG as a respondent in the proceeding); *id.* at ¶ 11 (stating that on June 16, 2020, Krystina Amor initiated an arbitration proceeding with the AAA and named CSSG as a respondent in the proceeding).)

*Esschem, Inc.*, 321 F.R.D. 215, 218 (E.D. Pa. 2017) ("Heraeus moved for leave to amend over

two years after filing the complaint, *and about a month before the scheduled conclusion of*

*discovery*. . . .   The Court and the parties have already expended significant time and resources

on discovery-related motion practice." (emphasis added)); *Exeter Township v. Franckowiak*, No.

5:17-cv-2709, 2018 WL 1898630, at \*4 (E.D. Pa. Apr. 20, 2018) ("Here, discovery has closed on

the claims alleged in the initial Complaint.  As Franckowiak points out, allowing the proposed

claims against Gardecki and against her would require the court to reopen discovery, and the

additional discovery needed would likely be substantial.").  Other cases this Court has found in

which motions to amend are denied because of undue delay involve similar circumstances.  *See,*

*e.g.*, *Atl. Holdings Ltd.*, 2018 WL 5816906, at \*2, \*4 (denying motion to amend filed one month

before the close of fact discovery and finding that the plaintiff unduly delayed in seeking to

amend the complaint to add additional defendants); *Kiarie v. Dumbstruck, Inc.*, 473 F. Supp. 3d

350, 352–53, 359–60 (S.D.N.Y. 2020) (denying motion to amend to add two defendants and

finding undue delay where the motion to amend was filed "nearly a year after the Court-ordered

deadline for such amendments and nearly four months after the Court ordered the conclusion of

fact discovery").

　　At least one court in this Circuit has held that a motion to amend filed at an early stage of

litigation was not unduly delayed, notwithstanding the fact that the lawsuit had been initiated

over twelve months ago.[17]  *See Bamgbose v. Delta-T Grp., Inc.*, 724 F. Supp. 2d 510, 518 (E.D.

---

[17] In their opposition brief, Defendants state, "Over eighteen months ago, CSPA moved to compel
arbitration of Plaintiffs' claims."  (Doc. No. 148 at p. 7.)  The Court notes, however, that there are two
reasons the Court was delayed in ruling on the motion to compel:  first, the parties informed the Court
that it should decide CSOKI's motion to dismiss for lack of personal jurisdiction before deciding the
motion to compel arbitration and then, once the Court ruled that jurisdictional discovery was proper (*see*
Doc. Nos. 133–34), the parties requested additional time to complete said discovery, twice (*see* Doc. Nos.
136, 138).  Second, in May 2021, the parties represented to the Court that they were engaging in
settlement negotiations in earnest.  Unfortunately, in September 2021, the parties informed the Court the

Pa. 2010) (finding that the plaintiff's motion to add three new defendants was "not brought with undue delay or dilatory motive" and noting that "although this action has been pending for over one year, it is still in a relatively early stage because the issue of conditional certification has not yet been decided fully.  The delay, then, is not all that lengthy, particularly in the FLSA context." (collecting cases)); *cf. Copantitla v. Fiskardo Estiatorio, Inc.*, No. 09 Civ. 1608(RJH)(JCF), 2010 WL 1327921, at \*1–\*2, \*7 (S.D.N.Y. Apr. 5, 2010) (granting plaintiff's motion to amend to add an additional defendant, where the motion was filed eleven months after the complaint had been filed).  Although the Court understands Defendants' frustration regarding the delay, we cannot find that the prejudice to Defendants outweighs the liberal pleading standard applied in the undue delay context.

    ***Futility.***  Defendants argue that the amendments are futile because Plaintiffs do not plausibly allege that CSSG and CSMG were their employers within the meaning of the FLSA. We agree.

    "'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted.'"  *Holst v. Oxman*, 290 F. App'x 508, 510 (3d Cir. 2008) (cleaned up); *see also Anderson v. City of Philadelphia*, 65 F. App'x 800, 801 (3d Cir. 2003).  "In assessing 'futility,' the District Court applies the same standard of legal sufficiency as applies under Rule 12(b)(6)."  *Holst*, 290 F. App'x at 510 (cleaned up); *see also Anderson*, 65 F. App'x at 801.  "In determining whether the proposed amendment states a plausible claim, the court must consider only those facts alleged in the proposed amended complaint, accepting the allegations as true and drawing all logical inferences in favor of the plaintiff.  Courts are not, however, bound to accept as true legal conclusions couched as factual allegations and a proposed amended complaint must

---

negotiations were unsuccessful.

contain enough facts to state a claim to relief that is plausible on its face." *Harris v. Steadman*, 160 F. Supp. 3d 814, 817 (E.D. Pa. 2016) (cleaned up).

"The FLSA requires that the Defendants be the Plaintiffs' 'employer' in order to be subject to the law's restrictions, and a court's inquiry often beings with that threshold question." *Williams v. Bob Evans Rests., LLC*, 2:18-cv-01353, 2020 WL 4692504, at *5 (W.D. Pa. Aug. 13, 2020); *see also Thompson v. Real Estate Mortg. Network*, 748 F.3d 142, 148 (3d Cir. 2014) ("Our first inquiry in most FLSA cases is whether the plaintiff has alleged an actionable employer-employee relationship."); *Davis v. Abington Mem'l Hosp.*, 817 F. Supp. 2d 556, 563 (E.D. Pa. 2011) ("The basic prerequisite for any FLSA lawsuit is an employment relationship between the plaintiffs and defendant.  Thus, in a FLSA collective action, every defendant must have been the employer of at least one named plaintiff.").  An employer is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. § 203(d); *see also Thompson*, 748 F.3d at 148.

Under the FLSA, in certain situations, multiple entities can be considered "joint employers" of a single employee.  *Id.*; *see also In re Enterprise*, 683 F.3d at 468; *Williams*, 2020 WL 4692504, at *4 ("Two or more distinct entities can exert significant control over the same employee such that they are 'joint employers.'").  "One such scenario occurs where both employers 'exert significant control' over the employee, 'by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.'"  *Thompson*, 748 F.3d at 148 (citations omitted).  In determining whether a joint employer relationship exists, courts in this Circuit must consider a non-exhaustive list of factors:

> (1) the alleged employer's authority to hire and fire the relevant employees; (2) the alleged employer's authority to promulgate work rules and assignments and to set the employees' conditions of employment: compensation, benefits, and work schedules, including the rate and method of payment; (3) the alleged employer's

involvement in day-to-day employee supervision, including employee discipline; and (4) the alleged employer's actual control of employee records, such as payroll, insurance, or taxes.

*Id.* at 149. "The Court may also consider the totality of the circumstances, economic realities, and other information suggesting 'significant control,' which can be persuasive in conjunction with the enumerated elements of the test." *Williams*, 2020 WL 4692504, at *4.

In the proposed second amended complaint, Plaintiffs allege that CSSG, CSOKI, and CSMG are joint employers. (Doc. No. 146-4 at ¶ 29 ("Upon information and belief, Defendants operate in concert and together in a common enterprise and through related activities, as here relevant, so that the actions of one may be imputed to the other and/or so that they operate as joint employers within the meaning of the FLSA and the applicable state wage laws.").) In addition, Plaintiffs plead the following:

- "During the period that Chapman worked for Defendants [CSOKI, CSSG, CSMG], Defendants [CSOKI, CSSG, and CSMG] employed him and other Sales Representatives within the meaning of 29 U.S.C. §§ 203(d) and 203(g) to sell Verizon cellular service and equipment in their Verizon authorized retail stores. Defendants [CSOKI, CSSG, and CSMG] employed Chapman and other Sales Representatives in interstate commerce and in an enterprise engaged in the production of goods for interstate commerce within the meaning of 29 U.S.C. § 203(s)(1)(A)." (Doc. No. 146-4 at ¶ 16; *see also id.* at ¶ 38 ("Defendants [CSOKI, CSSG, and CSMG] employed Chapman as a Sales Representative at a store in Tarboro, NC to sell Verizon cellular service and related equipment.").)

- "Each Defendant employed or acted in the interest of an employer towards Plaintiffs and other similarly situated current and former Sales Representatives and, directly or indirectly, jointly or severally, including, without limitation, control and direct the terms of employment and compensation of Plaintiffs and other similarly situated current and former Sales Representatives." (*Id.* at ¶ 28.)[18]

These are conclusory allegations and do not support a FLSA claim against the newly added

---

[18] In their reply brief, Plaintiffs argue that these allegations are sufficiently specific to establish joint employer liability under the FLSA. (Doc. No. 149 at p. 13 (citing Doc. No. 146-3 at ¶¶ 12, 16, 28, 29).). In light of the case law discussed below, we disagree.

Defendants, CSSG and CSMG, as they fail to plausibly show that CSSG and CSMG were Plaintiffs' joint employers.

*Williams v. Bob Evans Restaurant* is instructive and guides the Court's ruling. In that case, the plaintiffs alleged that "Defendants are/were a single and joint employer with a high degree of interrelated and unified operations, sharing common management between restaurant locations, sharing common employees between locations, as well as sharing human resources and payroll services" and that "[a]ll of Defendants' locations share the common labor policies and practices complained of therein." 2020 WL 4692504, at *5. The Court held that the complaint "consist[ed] of bare legal conclusions not entitled to credit at the motion to dismiss stage" and that these conclusory allegations "prevent[ed] the Court from assessing the exact nature of the employee–employer relationship that is being asserted." *Id.* The Court also explained that "[t]he Plaintiffs' insistence on referring to the Defendants collectively and failing to plead individual facts as to each Defendant is fatal to the validity of the claim that BEF Inc. was their single or joint employer." *Id.* at *5–6 ("The cases already discussed, and others, counsel that the Plaintiffs make some more than de minimis factual allegations with respect to each defendant's role in the employer-employee relationship in order to support a . . . joint employer theory."); *see also Attanasio v. Cmty. Health Sys., Inc.*, 863 F. Supp. 2d 417, 425–26 (M.D. Pa. 2012) (finding that the plaintiffs had failed to plead that CHS was a joint employer because "even beyond [the fact] that these pleadings are boilerplate, is that there are no operative details suggesting exactly *how* CHS exercised authority over the particular employees, *how* these employees were supervised by a Delaware corporation headquartered in Tennessee acting through a holding company, and *how* they oversaw the administration of the business records. . . . There are no supporting details as to the mechanics of CHS's actual involvement . . . that

would raise Plaintiff's assertions above a speculative level"); *Boyce v. SSP Am. MDW, LLC*, No. 19 C 2157, 2019 WL 3554153, at *4 (N.D. Ill. July 31, 2019) ("Looking to all the circumstances alleged here, [the plaintiff] does not allege enough detail about SSP's role or actions to establish that it controlled his working conditions. [The plaintiff] does not allege, for example, which entity hired him, which entity paid him, or which entity directly supervised his work. Most of [the plaintiff's] allegations refer generally to 'Defendants,' which he defines to include both MDW and SSP, but such vague and undifferentiated allegations are not sufficient to establish a joint-employer relationship. [The plaintiff] must allege facts showing which particular entity or entities controlled his working conditions in order to proceed under a joint-employer theory, and his Complaint does not do so."); *Ivery v. RMH Franchise Corp.*, 280 F. Supp. 3d 1121, 1129 (N.D. Ill. 2017) ("[T]he amended complaint fails to plausibly show that RMH Franchise was her joint employer. . . . [M]any of [the plaintiff's] allegations simply parrot factors relevant to the issue of joint employment, including conclusory statements like: 'Defendants share control over the terms and conditions of AMs' employment'; 'Each Defendant, directly or indirectly and jointly or severally, directed the terms of employment and compensation of Plaintiff'; and 'Each Defendant had the power to control the terms and conditions of employment of Plaintiff.' These sorts of conclusory allegations are not entitled to a presumption of truth.").

In contrast, in *Thompson v. Real Estate Mortgage Network*, the Third Circuit held that the plaintiff plausibly pleaded that two entities, REMN and Security Atlantic, were joint employers under the FLSA. 748 F.3d at 14. There, the amended complaint pleaded specific facts such as: (1) an REMN employee conducted the plaintiff's training after she was hired by Security Atlantic, "indicating that REMN had at least some authority to 'promulgate work rules and assignments'"; (2) the employee conducting the training "described REMN as Security

Atlantic's 'sister company,' a term which suggests some broader degree of corporate intermingling"; and (3) the plaintiff described a scenario where she and other Security Atlantic employees were integrated into REMN's commercial mortgage business while continuing to be paid by Security Atlantic, "supporting [the plaintiff's] claim that the two companies shared authority over hiring and firing practices." *Id.*

The allegations at issue in this case are more similar to those in *Williams* than those in *Thompson*. (*See* Doc. No. 146-4 at ¶¶ 16, 28–29, 38.) Nowhere in their complaint do Plaintiffs plead any specific facts indicating that CSSG, CSMG, and CSPA were joint employers, such as that employees of CSSG or CSMG conducted their training, that CSSG or CSMG hired them or had responsibility for disciplining them, or that individuals supervising them represented that CSSG and CSMG were sister organizations to CSPA, among other things.

In their reply brief, Plaintiffs argue that their allegations satisfy the *Twombly/Iqbal* pleading standard, citing *Johnson v. Mattress Warehouse, Inc.*, Civil Action No. 20-891, 2020 WL 2839109 (E.D. Pa. June 1, 2020) and *Jordan v. Meridian Bank*, Civil Action No. 17-5251, 2018 WL 6079314 (E.D. Pa. Nov. 20, 2018). (Doc. No. 149 at p. 12.) *Johnson* and *Jordan* are inapposite: neither *Johnson* nor *Jordan* involved the joint employer theory of liability. *See Johnson*, 2020 WL 2839109, at *3 ("Defendants argue that Count II should be dismissed because the Complaint fails to allege which Defendants implemented the scheme, what the scheme consisted of, what concrete actions Defendants took to enact the scheme, how the Plaintiffs discovered the scheme, and which Loan Officers were affected by the scheme. . . . Since allegations of a 'scheme' are not necessary to state a *prima facie* claim for an FLSA overtime violation, we conclude that Plaintiffs' failure to include such detail in the Complaint does not necessitate the dismissal of Count II."); *Jordan*, 2018 WL 6079314, at *3 (denying motion to

dismiss where the employer-defendant claimed that certain exemptions applied that barred the plaintiff from bringing the case and reasoning that because "FLSA exemptions are construed narrowly against the employer," discovery was needed before making such a determination).

Plaintiffs also appear to argue that because they attached hundreds of pages of jurisdictional discovery to their supplemental memorandum of law in support of their opposition to Defendants *CSOKI and CSPA's* motion to dismiss for lack of personal jurisdiction, this saves their failure to plausibly allege that CSSG, CSMG, and CSPA were joint employers in their proposed second amended complaint.  (*See, e.g.*, Doc. No. 149 at p. 11 ("Cellular Sales' attempt to argue [futility] falls flat in the face of evidence that CSSG and CSMG, as wholly owned subsidiaries of Defendant CSOKI, operate and manage its regional subsidiaries." (citing generally to Doc. No. 142)); *id.* at p. 12 ("Plaintiffs have detailed in two separate briefs using Defendants' 30(b)(6) witness deposition testimony the roles that CSSG and CSMG have in supervising, managing, and carrying out the day-to-day functions for all CSOKI subsidiaries." (citing generally to Doc. No. 142)).)  This is not so.  The standard for considering whether a proposed amendment is futile is the same as that for deciding motions to dismiss, pursuant to which the Court need only consider the allegations in the complaint or any document that is explicitly relied upon or integral to the complaint.  *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) ("As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings.  However an exception to the general rule is that a document *integral to or explicitly relied* upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment."); *see also Kiarie*, 473 F. Supp. 3d at 355 (denying a motion to amend to add two defendants because the plaintiff failed to plead with specificity that those two individuals were his employers within the

38

meaning of the FLSA and rejecting the plaintiff's argument that there is "evidence outside the record that could shore up the allegations of the complaint," because "[o]f course, we do not consider any such evidence inasmuch as it is well-settled that in deciding a motion to dismiss, a court is limited to consideration of the allegations of the complaint, as well as certain materials not relevant here" and "[t]he same principle applies to a proposed complaint challenged on 'futility' grounds in the course of a motion to amend").  Furthermore, "judges are not like pigs, hunting for truffles buried in the record."  *United States v. Morton*, 993 F.3d 198, 204 n.10 (3d Cir. 2021); *Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 820 n.8 (3d Cir. 2006) (cleaned up).

Last, Plaintiffs note in their reply that they "allege[d] the same joint employer facts as to [CSPA] in their original Complaint, and Defendants never previously challenged the specificity of the pleadings."  (Doc. No. 149 at p. 15.)  But that is neither here nor there.  The fact that CSPA chose not to file a motion to dismiss for failure to state a claim as to it does not impact whether the proposed second amended complaint states a claim against CSSG and CSMG.  *See Kiarie*, 473 F. Supp. 3d at 356 ("In something of a non sequitur, Kiarie also argues that if the proposed [first amended complaint] is insufficient to Dura and Gibson, the original complaint is insufficient as to the other individual defendants.  The Court agrees that the original complaint may well be insufficient as to the other individual defendants.  But the fact that defendants chose not to make a motion to dismiss as to those defendants has no bearing on whether the proposed [first amended complaint] before the Court meets the *Iqbal* standard as against Dura and Gibson.").

Because Plaintiffs have failed to plausibly allege that CSSG and CSMG were their employers within the meaning of the FLSA, the second amended complaint, as currently pled,

fails to state a FLSA claim against CSSG and CSMG.  Therefore, granting Plaintiffs leave to file the proposed second amended complaint is futile, and we will deny Plaintiffs' motion for leave to amend.

Because the Court finds that Plaintiffs do not plausibly allege that CSSG and CSMG were their employers within the meaning of the FLSA, the Court need not consider Defendants' other futility argument—namely, that the amendments are futile because Plaintiffs will be compelled to arbitrate under the terms of the Dealers Compensation Agreement ("DCA") that each Plaintiff signed.

For these reasons, we deny Plaintiffs' motion to amend.[19]

## II.     Conclusion

For the foregoing reasons, the Court grants CSOKI's motion to dismiss for lack of personal jurisdiction and denies Plaintiffs' motion for leave to file an amended complaint.

---

[19] Plaintiffs also argue that adding CSSG and CSMG as Defendants is proper under Federal Rule of Civil Procedure 20.  (Doc. No. 146-1 at pp. 22–24.)  Rule 20 governs permissive joinder of parties.  Rule 20(a)(2) provides that "[p]ersons . . . may be joined as defendants if: (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action."  Fed. R. Civ. P. 20(a)(2)(A)–(B).  However, even assuming that the proposed joinder of CSSG and CSMG satisfies the Rule 20(a)(2) requirements, the proposed amendment is futile under Rule 15(a)(2).  *See Exeter Township*, 2018 WL 1898630, at *4 ("[E]ven assuming, again, that the proposed joinder of Gardecki satisfies the requirements of Rule 20(a), the proposed amendment would cause undue prejudice under Rule 15(a)(2).");  *Bamgbose*, 724 F. Supp. 2d at 518 ("A court has discretion to deny a motion for joinder, even if the conditions of Rule 20(a) are met, in order to prevent undue delay or other prejudice to the other parties.").