**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JESSICA DEARDORFF, et al.**, | **CIVIL ACTION** |
| Plaintiffs, | |
| *v.* | **NO. 19-2642-KSM** |
| **CELLULAR SALES OF KNOXVILLE, INC., et al.**, | |
| Defendants. | |

**MEMORANDUM**

**MARSTON, J.**            **June 1, 2023**

Presently before the Court is Defendants Cellular Sales of Knoxville's ("CSOKI") and Cellular Sales of Pennsylvania's[1] ("CSPA") Motion for Fees and Sanctions Against Plaintiffs' Counsel pursuant to 28 U.S.C. § 1927, Local Rule 83.6.1, and the Court's inherent authority. (Doc. No. 168.) Defendants argue that Plaintiffs' counsel abused the judicial process in bad faith and unnecessarily multiplied proceedings by bringing a baseless proposed class and collective action and by opposing Defendants' motion to compel arbitration. (*See id.*)

For the reasons discussed below, the Court denies the motion.

---

[1] As is discussed in the procedural history below, the Court dismissed CSOKI as a defendant on February 1, 2022. (*See* Doc. No. 163 (granting CSOKI's motion to dismiss for lack of personal jurisdiction and dismissing CSOKI as a defendant).) However, because CSOKI and CSPA refer to themselves as "Defendants" in the motion for fees and sanctions (*see* Doc. No. 168 ("Defendants Cellular Sales of Knoxville, Inc. and Cellular Sales of Pennsylvania, LLC respectfully move for sanctions against Plaintiffs' counsel and for attorneys['] fees in the amount of $496,851.75, plus the attorneys' fees that Defendants incur in connection with this Motion.")) and were both Defendants at the time of most of the underlying events giving rise to this motion, and to minimize confusion, the Court refers to CSOKI and CSPA as "Defendants" in this Memorandum.

I.    **Factual Background and Procedural History**

   A.  *Pre-Suit Letters*

On April 4, 2019, Molly Brooks, Esq., sent an email to Defendants' counsel, stating that she represented former Cellular Sales representative David Chapman and that Chapman sought to "recover unpaid overtime wages under the Fair Labor Standards Act ('FLSA') and state wage and hour laws on behalf of himself and other similarly situated individuals." (Doc. No. 14-2 at 11.) In the letter, Brooks requested that Cellular Sales engage in pre-litigation settlement discussions. (*See, e.g.*, *id.* ("We encourage Cellular Sales to engage in dialogue with us to explore the possibility of an early resolution, before the parties begin extensive and costly litigation to file, prove, and value these claims."); *id.* at 13 ("We are willing to postpone our plan to file these claims to engage in pre-suit settlement discussions.").) Referencing arbitration, Brooks stated, "It is unlikely that an arbitration agreement will preclude notice and collective treatment for all class members. But even if an agreement exists and can be enforced, a significant number of class members will bring their claims in arbitration where the cost of litigating the claims will quickly outpace the liability." (*Id.*)

On April 17, Defendants' counsel responded to Brooks. (*Id.* at 15–16.) Of note, Defendants' counsel stated, "Your assumption that the arbitration and class waiver agreement would not preclude certification is contrary to the holdings of the cases of which I am aware where this issue has been addressed." (*Id.* at 16 (collecting cases).) He continued, "Further, our research has not revealed a single case where the court has permitted conditional certification when the entire putative class signed a valid arbitration and class waiver agreement and the defendant promptly moved to compel arbitration, as will be the case here. If you have some law to the contrary, please let me know." (*Id.*)

### B.  The Initiation of this Lawsuit[2]

A couple of months later, on June 18, 2019, Plaintiffs Jessica Deardorff and David

Chapman sued CSOKI, CSPA, and Cellular Sales of North Carolina[3] ("CSNC").  (Doc. No. 1.)

On August 28, 2019, Plaintiffs filed an Amended Complaint.  (Doc. No. 33.)  Plaintiffs brought

the action on behalf of themselves and others similarly situated.  (*See* Doc. Nos. 1, 33.)  Plaintiffs

are represented by Michael Sweeney, a partner with the law firm of Getman, Sweeney, & Dunn,

PLLC ("GSD") and Brooks, a partner with the law firm Outten & Golden LLP.[4]  (*See* Doc. No.

168-5 at ¶ 4; *see also* Doc. No. 33 at 24–25.)

Deardorff and Chapman worked as sales representations for Cellular Sales.  They claim

that they worked more than 40 hours per week and that, as a result of company-wide pay policies

and practices, they were denied overtime in violation of the Fair Labor Standards Act ("FLSA)",

the Pennsylvania Minimum Wage Act ("PMWA"), the Pennsylvania Wage Payment and

Collection Law ("PWPCL"), and the North Carolina Wage and Hour Act ("NCWHA").  (*See*

*generally* Doc. No. 1.)

Plaintiffs served Defendants on or around September 6, 2019.  (Doc. No. 168-5 at ¶¶ 5–6;

*see also* Doc. Nos. 168-6, 168-7, 168-8, 168-9, 168-10, 168-11.)  Prior to serving Defendants,

---

[2] This case was reassigned from the Honorable Nitza I. Quinones Alejandro to the Honorable Karen
Spencer Marston on February 27, 2020.  (Doc. No. 95.)

[3] CSNC was dismissed as a defendant on August 25, 2020.  (Doc. No. 133 at 2, 6 (noting that the parties
"agree that this Court does not have personal jurisdiction over [CSNC]" and dismissing CSNC as a
defendant); Doc. No. 134 at 1.)

[4] Plaintiffs were also represented by Deirdre Aaron, Esq., who was previously a partner at Outten &
Golden and is currently a partner at Winebrake & Santillo, LLC.  (*See* Doc. No. 168-5 at ¶ 4; Doc. No. 33
at 24.)  However, on December 7, 2022 (after Defendants filed the instant motion), Plaintiffs filed a
motion to withdraw the appearance of Aaron, noting that she had not been affiliated with Outten &
Golden for nearly a year.  (Doc. No. 170 ("Ms. Aaron was no longer affiliated with Outten & Golden LLP
as of December 31, 2021.").)  That same day, the Court granted Plaintiffs' motion to withdraw Aaron as
counsel of record.  (Doc. No. 172.)

GSD posted a webpage on their law firm's website that informed other Cellular Sales sales representatives about the lawsuit and how to join it.  (*See* Doc. No. 168-5 at ¶ 7; Doc. No. 14-2.) This prompted CSPA to file an Emergency Motion for a Protective Order, arguing that the webpage included several inaccurate or misleading statements, including implying that liability was uncontested and that anyone was eligible to join the suit even though class certification had not yet occurred and all sales representatives had agreed to arbitrate on an individual basis.  (*See* Doc. No. 168-5 at ¶ 9; Doc. No. 14.)  As to the claims brought, the webpage stated, "The case challenges the failure of Cellular Sales to pay overtime wages to Plaintiffs for hours over 40 in a week.  In addition to the Fair Labor Standards Act claim, Plaintiffs also bring a claim for failure to pay wages when due under both the North Carolina Wage and Hour Act and the Pennsylvania Minimum Wage Act."  (Doc. No. 14-2.)  As to joining the case, the webpage provided, "Anyone who has worked for Cellular Sales as a sales representative or similar position in the last 3 years is eligible to join this case by filling out and signing a Consent to Sue form and returning it to [GSD]."  (*Id.*)  Subsequently, Plaintiffs' counsel revised the website to address some of the concerns Defendants raised.  (*See* Doc. No. 168-5 at ¶ 9; Doc. No. 21-2 (a redline of the website, showing that the term "alleged" was added in several places to show that liability was contested and indicating that sales representatives can "ask to join" the case rather than stating they are "eligible to join" the case).)  Defendants still took issue with the revisions, as Plaintiffs' counsel still did not inform sales representatives that they are subject to individual arbitration.  (Doc. No. 168-5 at ¶ 9; Doc. No. 25 at 7–11.)  However, two years later, in September 2021, following a court conference, CSPA agreed to withdraw its emergency motion for protective order.  (Doc. Nos. 157–59.)

Ultimately, CSOKI and CSNC moved to dismiss for lack of personal jurisdiction, and

CSOKI and CSPA moved to compel arbitration.  (*See, e.g.*, Doc. Nos. 12, 43, 65.)

Of note to the motion to compel, Deardorff and Chapman each signed Dealer Compensation Agreements ("DCAs").  (*See* Doc. No. 12-3, Ex. B-7 at 94–101 (Deardorff's May 15, 2017 DCA); Doc. No. 12-3, Ex. B-8 at 102–09 (Chapman's Mar. 7, 2017 DCA); Doc. No. 12-3, Ex. B-9 at 110–18 (Chapman's Dec. 26, 2017 DCA).)  The DCAs outline how a dealer (i.e., a sales representative) will be compensated, including how commissions will be calculated and paid and how dealers should record their time.  (*See, e.g.*, Doc. No. 12-3, Ex. B-7 at ¶¶ 2–11.)  The DCAs also contained dispute resolution provisions. (*See* Doc. No. 12-3, Exs. B-7, B-8, B-9.)  Chapman's March 2017 DCA contained the same dispute resolution provision that was in Deardorff's DCA.  (*See* Doc. No. 12-3, Ex. B-8 at ¶ 15; Doc. No. 12-3, Ex. B-7 at ¶ 15.)  Chapman's December 2017 DCA's dispute resolution provision included minor differences. (*See* Doc. No. 12-3, Ex. B-9 at ¶ 16.)

### C.  The Court's August 25, 2020 Memorandum

On August 25, 2020, the Court issued a Memorandum and Order on CSOKI and CSNC's motion to dismiss for lack of personal jurisdiction,[5] dismissing CSNC as a defendant and finding that Plaintiffs had not met their burden of showing by competent evidence that the Court could exercise specific or general jurisdiction over CSOKI.  (Doc. Nos. 133, 134.)  However, given the Third Circuit's liberal standard for jurisdictional discovery, the Court permitted Plaintiffs to take limited jurisdictional discovery and reserved ruling on the motion.  (Doc. No. 133 at 13–19; Doc. No. 134.)

---

[5] During oral argument on the motion, which was held on August 4, 2020, the parties agreed that the Court should decide the motion to dismiss for lack of personal jurisdiction before the motion to compel arbitration.  (Doc. No. 133 at 2.)

### D.  Plaintiffs' Activities Pending the Court's Ruling on the Motions

While the motions to dismiss for lack of personal jurisdiction and to compel arbitration were pending, Plaintiffs' counsel continued to advertise the lawsuit online.  (Doc. No. 168-5 at ¶¶ 12–13; Doc. No. 168-12 (July 6, 2021 printout of the webpage); Doc. No. 168-13 (January 7, 2022 printout of the webpage).)  The webpage stated, "Anyone who has worked for Cellular Sales as a sales representative or similar position at any time since June 18, 2016 can ask to join this case.  To do so, you must fill out and sign a Consent to Sue form and return it to [GSD]."  (Doc. No. 168-12 at 2; Doc. No. 168-13 at 2.)  It also included links to the Complaint and the Consent to Sue form and included information about the claims.  (*Id.*)

In addition, while the motions were pending, Plaintiffs' counsel initiated four separate arbitration proceedings on behalf of four opt-in plaintiffs—Marcus Hill,[6] Travis Thomas,[7] Krystina Amor, and Patrick McConnon—who had also previously filed consent to sue forms in this case.  (Doc. No. 168-5 at ¶ 14; *see also* Doc. No. 168-14 (Hill's April 24, 2020 arbitration demand filed with the American Arbitration Association ("AAA") pursuant to his DCA); Doc. No. 168-15 (Thomas's April 24, 2020 arbitration demand filed with JAMS pursuant to his

---

[6] The award in Hill's arbitration proceeding was issued on May 25, 2022 (Doc. No. 168-5 at ¶ 20; Doc. No. 168-29.)  The arbitrator found that Hill "did not meet his burden to establish that he was not properly classified as an exempt employee pursuant to the FLSA" or to "demonstrate any violation of North Carolina law."  (Doc. No. 168-29 at 3.)  The arbitrator also found that respondents in that arbitration, CSNC and CSSG, established that Hill was "unjustly enriched and overpaid due to improper overreporting of his hours worked" but did "not establish fraud, theft by false pretenses, or that [Hill's] payment of attorneys' fees is appropriate at this time."  (*Id.* at 3.)

[7] The award in Thomas's arbitration proceeding was issued on June 7, 2022.  (Doc. No. 168-5 at ¶ 20; Doc. No. 168-30 at 12.)  The arbitrator found that Cellular Sales did not violate the FLSA.  (Doc. No. 168-30 at 9–11; *see also id.* at 10 ("[T]he Arbitrator finds that Cellular Sales did not violate the FLSA by failing to pay Thomas for any unpaid overtime hours due to his failure to follow reasonable procedures to report off-shift time.").)  The arbitrator declined to rule on the counterclaim of the respondent there, Cellular Sales of Northern Florida, LLC.  (*Id.* at 11.)

DCA); Doc. No. 168-16 (McConnon's June 12, 2020 arbitration demand filed with the AAA

pursuant to his DCA); Doc. No. 168-17 (Amor's June 16, 2020 arbitration demand filed with the

AAA pursuant to her DCA).)  Even after Hill and Thomas pursued arbitration of their claims,

Plaintiffs refused to dismiss Hill and Thomas as opt-ins in the instant case unless Defendants

agreed to toll their claims.[8]  (*See* Doc. No. 168-5 at ¶ 19; Doc. No. 168-18 ("Plaintiffs will agree

not to oppose Respondents' supplemental filing seeking dismissal of Mr. Hill and Mr. Thomas if

Respondents agree to toll their claims.").)

### E.  Communications about Mediation and Sanctions Pending the Court's Ruling on the Motions

In 2021, while the personal jurisdiction and arbitration motions were pending, the parties

agreed to engage in settlement negotiations and hired a third-party mediator to assist them.[9]

(Doc. No. 174-1 at ¶ 4.)  On September 20, 2021, shortly before the start of mediation,

Defendants' counsel sent Plaintiffs' counsel a letter, which stated that Defendants would move

for sanctions if the mediation did not end in settlement.  (*Id.* at ¶ 5; *see also* Doc. No. 174-2

("[T]he positions you and your clients have taken in this matter, including . . . the decision to

contest arbitration of clearly arbitrable claims have made attorney's fees the biggest impediment

to settlement.  In that regard, I wanted to let you know that absent resolution of this matter at

mediation, Cellular Sales . . . [will] be seeking Rule 11 sanctions against you and your firms.").)

In a letter dated September 23, 2021, Plaintiffs' counsel raised concerns about the timing of the

---

[8] Defendants refused to agree to toll Hill and Thomas's statute of limitations, but on November 7, 2022, Plaintiffs withdrew this request given that their claims had been resolved in arbitration already.  (Doc. No. 166-1 ("[P]lease take notice that because Travis Thomas and Marcus Hill resolved their claims in arbitration, Plaintiffs withdraw their request that the Court toll their statute of limitations.").)

[9] On May 17, 2021, Plaintiffs emailed the Court to inform them of the parties' initiation of mediation discussions.  On July 13, 2021, the Court requested a status update on the parties' progress with mediation, at which point Plaintiffs responded that the parties were scheduled to attend an initial mediation session on September 23, 2021.

letter they received.  (*See* Doc. No. 174-3 ("We are concerned based on the timing of your letter and specific statements in it that you are threatening sanctions for an improper purpose of gaining leverage in settlement negotiations.  Not only did you send your letter just before we are about to attend mediation, but you waited more than two years after we filed our complaint to do so.  If you had real concerns that our conduct has been sanctionable, we suspect that you would have informed us of such soon after we engaged in the conduct that you identify.").)

### F.  The Court's February 1, 2022 Memorandum

Following jurisdictional discovery, CSOKI renewed its motion to dismiss for lack of personal jurisdiction (Doc. No. 65), the parties filed supplemental briefing (Doc. Nos. 142, 147), and Plaintiffs filed a motion for leave to file a second amended complaint (Doc. No. 146), all of which the Court addressed in a February 1, 2022 Memorandum and Order (Doc. Nos. 162, 163).

First, the Court rejected Plaintiffs' contention that the Court could exercise personal jurisdiction over CSOKI (the parent company) based on an alter ego theory, whereby CSPA served as CSOKI's alter ego.  (Doc. No. 162 at 1–19.)  Plaintiffs argued that alter ego jurisdiction was appropriate because the Court had personal jurisdiction over CSPA (a subsidiary) and because two of CSOKI's other wholly owned subsidiaries, Cellular Sales Services Group ("CSSG") and Cellular Sales Management Group, LLC ("CSMG"), in turn exercised control over CSPA's day-to-day operations.  (*Id.* at 2–3.)  Upon analyzing the relevant factors and evidence, the Court concluded that Plaintiffs failed to show that CSPA was an alter ego of CSOKI.  (*Id.* at 5–19.)  Because alter ego jurisdiction was not proper, the Court granted CSOKI's motion to dismiss for lack of personal jurisdiction.[10]  (*Id.* at 19.)

---

[10] The Court also noted in its opinion, "Although the Court reserves ruling on the motion to compel arbitration, the instant briefing revealed the following:  Significantly, Plaintiffs' counsel initiated four separate arbitration proceedings on behalf of four individuals who had previously filed Consent to Sue forms in this action.  Those arbitration proceedings were initiated pursuant to the *very same arbitration*

Second, the Court denied Plaintiffs' motion for leave to amend their complaint to add CSSG and CSMG as Defendants, finding that the amendments were futile because Plaintiffs did not plausibly allege that CSSG and CSMG were employers within the meaning of the FLSA. (*Id.* at 32–40.)

### G. The Court's February 9, 2022 Memorandum

A week later, on February 9, the Court issued a Memorandum and Order granting CSPA's motion to compel arbitration.[11]  (*See* Doc. Nos. 164, 165.)  In the Memorandum, the Court analyzed controlling precedent and the language of Deardorff's DCA, considering first, whether the parties delegated threshold arbitrability questions to the arbitrator by clear and unmistakable evidence and second, whether Plaintiffs challenged the arbitration provision specifically.  (*See, e.g.*, Doc. No. 164 at 10–13 (examining the Supreme Court's *Rent-A-Center* decision and other controlling precedent, which provided that the parties can agree to arbitrate gateway issues of arbitrability if there is clear and unmistakable evidence that they did so and that the party opposing arbitration must challenge the delegation clause specifically).)

The Court found that Deardorff and CSPA clearly and unmistakably delegated questions of arbitrability to an arbitrator, not to the Court.  (*See id.* at 18; *see also id.* at 19 ("The emphasized language could not be clearer:  it compels the conclusion that the parties clearly and unmistakably delegated gateway issues of arbitrability to an arbitrator.  Indeed, the language is similar to other clauses that courts have held to be 'clear and unmistakable' evidence that the parties intended to arbitrate arbitrability." (collecting cases); *id.* (noting that the language "is also

---

*clause* that is at issue in this case—i.e., the clause in Deardorff and Chapman's [DCAs] that Plaintiffs argue is invalid and unenforceable here."  (*Id.* at 1–2 n.1 (internal citations omitted).)

[11] Defendants' instant motion for sanctions relies in large part on the facts and analysis set forth in this third Memorandum.  (*See* Doc. No. 168-1 at 17–18, 22.)

practically identical to the delegation clause in the [seminal] *Rent-A-Center* decision"); *id.* at 20 ("In addition, the fact that the parties incorporated the JAMS rules into their arbitration agreement by reference independently illustrates that the parties 'clearly and unmistakably' delegated threshold issues of arbitrability to an arbitrator. . . . As in *Richardson*, this provision 'is about as clear and unmistakable as language can get.'").)

Then, the Court concluded that Deardorff had not challenged the delegation clause specifically.  (*Id.* at 21.)  In doing so, the Court noted that Plaintiffs' two chief arguments in its opposition—(1) that the arbitration provision's class and collective waiver clause unlawfully interfered with their rights to engage in protected activity under the National Labor Relations Act ("NLRA"), and (2) that the arbitration provision can be reasonably inferred to prohibit employees from seeking relief—did not specifically challenge the delegation clause and only pertained to the enforceability of the arbitration provision as a whole.  (*Id.* at 21–22; *see also id.* at 23 ("As in *Colon*, Plaintiffs' argument that the arbitration provision is unenforceable because its class action waiver provision violates the NLRA 'suffers from' a critical 'deficiency':  it concerns a challenge to the arbitration provision in general, not the delegation clauses specifically.  Plaintiffs' exclusive focus on any violation of the NLRA 'miss[es] the mark' because the delegation clause is sever[able] from the rest of the DCA.").)   Accordingly, the Court granted CSPA's motion to compel Deardorff to arbitration.

As to Chapman, the Court found that the delegation clause in Chapman's March 2017 DCA (which was the exact same as the one in Deardorff's DCA) was valid, Chapman also agreed to delegate threshold issues of arbitrability to an arbitrator, and Chapman did not specifically challenge the arbitration clause.  (*Id.* at 26.)  However, because the Court could not compel Chapman to arbitrate in North Carolina—the forum the parties selected in his DCA—the

Court stayed the action, pending the arbitrator's decision on threshold issues of arbitrability in Deardorff's case.[12]  (*Id.* at 27.)

### H.  The Arbitration Proceedings

Following the Court's decision on the motion to compel arbitration, on March 4, 2022, Deardorff, who continued to be represented by GSD and Outten & Golden, filed her arbitration demand with JAMS.  (Doc. No. 168-5 at ¶¶ 21–22; Doc. No. 168-19 ("Pursuant to the District Court's order, Claimant files this arbitration demand to:  1) determine the arbitrability of the claims; and 2) if the claims are arbitrable, then to pursue her unpaid wage claims . . .").)  Deardorff listed three respondents in her demand:  CSOKI, CSPA, and CSMG.  (Doc. No. 168-21 at 2 n.1.)  The Honorable Thomas J. Reuter (Ret.) serves as the Arbitrator.  (Doc. No. 168-5 at ¶ 21.)

On July 13, 2022, Deardorff filed a Motion Concerning the Arbitrability of Her Wage and Hour Claims before the Arbitrator.  (Doc. No. 168-5 at ¶ 23; Doc. No. 168-20.)  The arguments in that motion primarily concerned Cellular Sales' counterclaim, which was asserted at the time the parties went to arbitration and sought legal fees and costs for Deardorff pursuing her claims in federal court.  (See Doc. No. 168-20 at 12–15 (section entitled "Cellular Sales' Counterclaim Undermines The FLSA's Important Public Policy Goals to Protect Employees"); *id.* at 16–22 (arguing that arbitration is unenforceable under the effective vindication doctrine because of Cellular Sales's counterclaim that seeks $500,000 in fees and costs); *id.* at 25–28 (arguing that Cellular Sales "counterclaim renders arbitration substantively unconscionable"); *see also id.* at 22 ("[D]ue to Cellular Sales' counterclaim, arbitration prevents the effective

---

[12] On May 30, 2023, the parties filed a Stipulation of Dismissal as to Chapman (Doc. No. 195), which this Court entered on May 31, 2023 (Doc. No. 196).

vindication of Deardorff's FLSA claims, and the Arbitrator should find that the claims are not arbitrable.").)  Aside from the counterclaim-related arguments, Deardorff also asserted that the arbitration agreement was procedurally unconscionable because the DCA was a form employment agreement.  (*Id.* at 24–25.)  The motion differed from Plaintiffs' opposition to the motion to compel arbitration in federal court in that, before the Arbitrator, Deardorff no longer argued that the arbitration provision's class and collective waiver clause unlawfully interfered with their rights to engage in protected activity under the NLRA.  (*See* Doc. No. 168-20 (failing to mention the NLRA); *see also* Doc. No. 168-31 (same).)   The Arbitrator held oral argument on the arbitrability motion on October 4, 2022.  (Doc. No. 168-5 at ¶ 24.)

On October 13, 2022, the Arbitrator issued a Memorandum and Order denying Deardorff's arbitrability motion.[13]  (Doc. Nos. 168-21, 168-22.)  As to the differences between Deardorff's arguments before this Court and before the Arbitrator, the Arbitrator wrote, "In the Federal Court Litigation, the only ground Claimant raised for refusing to arbitrate was that the arbitration provision and the class and collective action waivers in the DCA violated the [NLRA].  Claimant has abandoned this argument."  (Doc. No. 168-21 at 3–4.)  The Arbitrator then evaluated—and ultimately rejected—Deardorff's two arguments:  "that despite [the arbitration provision's] plain language, [it] should not be enforced because" the counterclaim violates FLSA public policy and the effective vindication doctrine.  (*See id.* at 6–11.)

---

[13] The Arbitrator noted that the viability of CSPA's counterclaim for $500,000 in attorneys' fees and costs was not before him for decision.  (Doc. No. 168-21 at 4; *see also id.* at 7 n.7 ("Despite the arbitration provision in the DCA, Claimant decided to litigate her claims in federal court and resisted all efforts to have the arbitrability of her claims determined by arbitration until ordered to do so by the District Court. Claimant could have avoided the Counterclaim had she filed her claims in the agreed forum. Respondent's motion in the Federal Court Litigation and the resultant Counterclaim were in reaction to Claimant's decision to pursue her claims in federal court.  The Arbitrator acknowledges the argument of Claimant's counsel that he acted in good faith in proceeding with the Federal Court Litigation as opposed to arbitration.  The Arbitrator is not herein considering, and has not considered, the merits of the Counterclaim or Respondents' entitlement to the relief requested therein.").)

First, the Arbitrator found that the arbitration clause in the DCA did not undermine the FLSA's purpose and objective, noting that it is well-settled that FLSA claims are arbitrable and that the provision here does not preclude Deardorff from asserting her FLSA and state law claims. (*Id.* at 7–8; *see also id.* at 8–9 ("Claimant has failed to state a public policy goal or protection of the FLSA or the state law claims that enforcement of the arbitration provision between the parties would compromise. . . . The arbitration provision should not be invalidated based upon public policy goals.").) Second, the Arbitrator concluded that the "[t]he terms of the arbitration provision do not render it unenforceable under the effective vindication doctrine" and that "the Counterclaim does not require invalidation of the arbitration provision" under the effective vindication doctrine either. (*Id.* at 9–10.) In his analysis as to the latter point, the Arbitrator emphasized that the "Counterclaim does not deter others from pursuing their wage and hour claims in the proper forum" nor does it "immunize the Respondents from liability for violation of state or federal laws."[14] (*Id.* at 11; *see also id.* ("Claimant's hour and wage claims and Respondents' Counterclaim are entirely separate claims. Claimant can pursue her claims in arbitration. The Counterclaim does not prevent Claimant from effectively vindicating her claims in arbitration. Respondents can pursue the Counterclaim in arbitration as well.").)

Following the Arbitrator's decision, on November 7, 2022, Plaintiffs withdrew the opt-ins from this case. (Doc. No. 166.)

---

[14] After the Arbitrator's ruling, Deardorff and respondents proceeded to arbitration. The following exchange occurred during Deardorff's deposition in connection with that arbitration:

> Q: When you filed the lawsuit in Pennsylvania back in 2019, you knew
> that your contract with the company had an arbitration provision, correct?
> A: Correct.
> Q: And with that knowledge, you still chose to participate in the lawsuit
> up in federal court, correct?
> A: I was instructed by counsel, correct.

(Doc. No. 190 at 7:8–15.)

### I.   *The Instant Motion*

On November 29, 2022, Defendants filed a Motion for Fees and Sanctions against Plaintiffs' Counsel Pursuant to 28 U.S.C. § 1927, Local Rule 83.6.1, and the Court's inherent authority, arguing, among other things, that Plaintiff's counsel's two-and-a-half year opposition to arbitration was unjustified, frivolous, and against the weight of the law.  (Doc. No. 168-1.) Defendants also highlight Plaintiffs' counsel's inconsistent positions—namely, that they abandoned their argument that the arbitration provision violated the NLRA before the Arbitrator and that they initiated arbitration proceedings with respect to four opt-ins but refused to do so in Deardorff's case, despite the fact that the very same arbitration clause appeared in all of the DCAs.  (*See id.*)  Plaintiffs oppose the motion.  (Doc. No. 174.)  Defendants filed a reply.  (Doc. No. 177.)   The Court held oral argument on February 27, 2023.[15]

### II.   **Legal Standard**

Under 28 U.S.C. § 1927, "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." "[Section] 1927 requires a court to find an attorney has (1) multiplied proceedings; (2) in an unreasonable and vexatious manner; (3) thereby increasing the cost of the proceedings; and (4) doing so in bad faith or by intentional misconduct."  *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 278 F.3d 175, 188 (3d Cir. 2002); *see also Ferguson v. Valero Energy Corp.*, 454 F. App'x 109, 112 (3d Cir. 2011).

Before a court imposes § 1927 sanctions, it must make a finding of bad faith.  *See In re Prosser*, 777 F.3d 154, 162 (3d Cir. 2015) ("A court imposing § 1927 sanctions must find bad

---

[15] Following oral argument, the parties met with a magistrate judge to potentially resolve this motion.  On April 19, 2023, the parties informed the Court that they had been unable to reach an agreement.

faith, but that finding need not be made explicitly."); *LaSalle Nat'l Bank v. First Conn. Holding Grp., LLC*, 287 F.3d 279, 289 (3d Cir. 2002) ("[T]he bad faith requirement is necessary for a finding of liability, otherwise an attorney who might be guilty of no more than a mistake in professional judgment in pursuing a client's goals might be made liable for excess attorneys' fees." (cleaned up)); *Zuk v. E. Pa. Psychiatric Institute of Med. Coll. of Pa.*, 103 F.3d 294, 297 (3d. Cir. 1996) ("[B]efore a court can order the imposition of attorneys' fees under § 1927, it must find wilful [sic] bad faith on the part of the offending attorney."); *Sweet Street Desserts, Inc. v. Better Bakery, LLC*, Civil Action No. 12-6115, 2017 WL 6311664 (E.D. Pa. Dec. 11, 2017) ("Due to [the] potential for abuse, it has been well-established that sanctions may not be imposed under 1927 without a finding that counsel's conduct resulted from bad faith, rather than misunderstanding, bad judgment, or well-intentioned zeal." (citation omitted)).  "Indications of . . . bad faith are findings that the claims advanced were meritless, that counsel knew or should have known this, and that the motive for filing the suit was an improper purpose such as harassment."  *In re Prosser*, 777 F.3d at 162 (cleaned up); *In re Prudential*, 278 F.3d at 188 (cleaned up); *see also In re Avandia Mktg., Sales Practices & Liab. Litig.*, 469 F. Supp. 3d 357, 360–61 (E.D. Pa. 2020) ("Bad faith may also be inferred where a party pursues claims that are clearly frivolous." (cleaned up)).

"[T]he principal purpose of imposing sanctions under 28 U.S.C. § 1927 is the deterrence of intentional and unnecessary delay in the proceedings."  *Zuk*, 103 F.3d at 297 (cleaned up).  "Although § 1927 provides a court with a mechanism for sanctioning vexatious and willful conduct, courts should exercise [this sanctioning power] only in instances of a serious and studied disregard for the orderly process of justice."  *LaSalle Nat'l Bank*, 287 F.3d at 288 (cleaned up).  "[T]he party seeking the imposition of sanctions must show by clear and

convincing evidence that they are warranted." *Johnson v. Smithkline Beecham Corp.*, Civ. No. 11-5782, 2015 WL 1004308, at *7 (E.D. Pa. Mar. 9, 2015).

Similarly, Local Civil Rule 83.6.1(b) provides, "No attorney shall . . . present to the court vexatious motions or vexatious opposition to motions . . . or shall otherwise so multiple the proceedings in a case as to increase unreasonably and vexatiously the costs thereof." "Local Rule 83.6.1 tracks the language of Section 1927, but is somewhat broader in scope because it takes into consideration the Court's inherent power to sanction." *Canada v. Samuel Grossi & Sons, Inc.*, Civil Action No. 19-1790, 2020 WL 8300132, at *2 (E.D. Pa. Sept. 11, 2020) (cleaned up); *see also Bright v. First Sr. Fin. Grp.*, Civil Action No. 12-360, 2013 WL 3196392, at *9 (E.D. Pa. June 24, 2013) ("Eastern District Local Rule 83.6.1 provides language identical to that of § 1927 in that it focuses on the 'vexatious' and 'unreasonable' nature of an attorney's behavior. Local Rule 83.6.1 is somewhat broader in scope than Section 1927 because it takes into consideration the Court's inherent power to sanction." (cleaned up)).

As with § 1927, before a court imposes sanctions based on its inherent authority or Local Rule 83.6.1, it must find bad faith on the part of the offending attorney. *See, e.g.*, *In re Prudential*, 278 F.3d at 181 ("[A]n award of fees and costs pursuant to the court's inherent authority to control litigation will usually require a finding of bad faith."); *Jarzyna v. Home Properties, L.P.*, 783 F. App'x 223, 227 (3d Cir. 2019) ("28 U.S.C. § 1927 and L.R. 83.6.1 authorize sanctions on a showing of bad faith."); *see also In re Avandia Mktg., Sales Practices & Liab. Litig.*, 469 F. Supp. 3d at 360 ("A finding of bad faith, proved by clear and convincing evidence, usually is required for sanctions imposed under § 1927, Local Rule 83.6.1, or the court's inherent powers."). The Court must conduct a specific and individualized analysis. *See In re Avandia Mktg., Sales Practices & Liab. Litig.*, 469 F. Supp. 3d at 360 ("A finding of bad

faith must be made with specificity, clearly linking any sanction imposed to particular conduct of an individual party or attorney."); *see also Grider v. Keystone Health Plan Cent., Inc.*, 580 F.3d 119, 144 (3d Cir. 2009) (vacating sanctions imposed by the district court and finding "it was an abuse of discretion [for the district court] to impose sanctions pursuant to [§ 1927 and Local Rule 83.6.1] without undertaking an individualized analysis").

## III.  Discussion

Although a close call, the Court cannot conclude that sanctions are warranted under § 1927, Local Rule 83.6.1, or the Court's inherent authority.  In particular, the Court finds that Defendants have failed to show, by clear and convincing evidence, that Plaintiffs' counsel acted in bad faith or by intentional misconduct.  Having considered all the facts, the Court notes that Plaintiffs' counsel's conduct was questionable at times; however, on the record before us, it does not reach the high bar required to warrant sanctions.

* * *

As a preliminary matter, the Court is unpersuaded by Defendants' argument that Plaintiffs' counsel "continued to multiply proceedings for over 2.5 years."  (Doc. No. 168-1 at 24; *see also id.* at 7 ("Plaintiffs then opposed the arbitration for almost 2.5 years while they used the lawsuit to round up opt-in plaintiffs across the nation.").)  As the timeline set forth in Section I illustrates, in August 2020, both parties agreed that the Court needed to decide the motion to dismiss for lack of personal jurisdiction *before* the motion to compel arbitration; jurisdictional discovery and supplemental briefing on the motion to dismiss for lack of personal jurisdiction were not complete until February 3, 2021[16]; not long after, on May 17, 2021, Plaintiffs informed

---

[16] Twice, the parties filed *joint* motions to extend the briefing schedule the Court had set forth in its August 25, 2020 Order.  (*See* Doc. No. 136 (Joint Motion for Adjournment of Briefing Schedule); Doc. No. 138 (Joint Motion to Modify Briefing Schedule).)

the Court that the parties would proceed to private mediation; and the initial mediation did not

occur until September 23, 2021.  Nor do Defendants argue that Plaintiffs proceeded to mediation

in bad faith or as a delay tactic.[17]

Further, Defendants' claim that Plaintiffs delayed proceedings by continuing to add opt-

in plaintiffs to the lawsuit, "forc[ing] [Defendants] to file supplements and other briefing to

address[] the opt-in plaintiffs' DCAs," lacks teeth.  (Doc. No. 168-1 at 13 (citations omitted).)

First, according to their own cites, Defendants filed their last opt-in-related pleading on May 5,

*2020* (less than a year after Plaintiffs initiated this lawsuit).  (*See* Doc. No. 168-1 at 13 (citing

Doc. Nos. 71, 89, 104, & 112); *see also* Doc. No. 112 (May 5, 2020 filing).)  Second, Defendants

did not file supplements to address each and every opt-in,[18] nor do they cite any authority to

support the position that they were compelled to do so.  Similarly, Defendants appear to suggest

that Plaintiffs improperly used solicitations on social media to round-up opt-ins and delay the

lawsuit.  (*See* Doc. No. 168-1 at 14, 26 ("[I]t is apparent this action was filed (and delayed) so

Plaintiffs' Counsel could advertise the lawsuit and continue to solicit potential clients.  Under

such circumstances, sanctions are appropriate.").)  But Defendants cite no authority that stands

for the proposition that solicitations on social media are indicative of bad faith.  To the contrary,

Defendants' counsel admitted at oral argument that solicitations are typical in these types of

---

[17] The Court notes that a mere three days before the long-awaited private mediation took place, Defendants threatened to seek Rule 11 sanctions and to request attorneys' fees if a resolution was not reached at mediation.  (Doc. No. 174-2.)  Therefore, to the extent a ruling on the motion to compel arbitration was delayed due to the parties proceeding to mediation, that delay appears to be attributable to *Defendants'* conduct, not Plaintiffs.  The Court also notes that despite threatening to bring Rule 11 sanctions on September 20, 2021, Defendants never brought a motion for Rule 11 sanctions, and filed the instant motion on November 29, 2022—well over a year after Defendants' initial threat.

[18] For example, Plaintiffs filed Notices of Filing of Consent to Sue on March 30, 2021; April 29, 2021; May 27, 2021; July 13, 2021; July 26, 2021; August 27, 2021; September 7, 2021; and September 20, 2021, none of which Defendants responded to.  (*See* Doc. Nos. 150, 151, 152, 153, 154, 155, 156, 160.)

cases.  (See Feb. 27, 2023 Hr'g Tr. at 27:1–19 ("[The Court]: I mean, in this sort of arena, this whole LinkedIn request, I know it's all – you are adding it up to be bad faith in this particular circumstance.  Is that sort of a normal course of action in these types of lawsuits if there wasn't a valid arbitration clause?  Mr. Carbo: Is there was or wasn't?  The Court: Wasn't.  Let's say you didn't have that.  Mr. Carbo:  Yes.  I have seen that before, and surely Pennsylvania is one of the areas where you see a lot of that.  But you definitely see LinkedIn solicitations with respect to claims that are pending where there is [sic] not arbitration provisions.  Quite frankly, a lot of the LinkedIn solicitations are quite creative and solicit individuals as part of an investigation into an ongoing matter.  But to answer Your Honor, yes, that certainly happens."); id. at 27:23–25 ("But surely, especially in Pennsylvania, there is quite a bit of it on the LinkedIn side, on the wage-and-hour claims.").)  Given Defendants' acknowledgement that LinkedIn solicitations are somewhat routine with wage-and-hour claims cases, the Court cannot find that these solicitations indicate bad faith or intentional misconduct on the part of Plaintiffs' counsel.  And, for the same reasons listed above, the Court does not find that Plaintiffs' counsel delayed the lawsuit.[19]

Next, the Court notes that at oral argument, Defendants' counsel argued that Brooks's April 4, 2019 letter was illustrative of Plaintiffs' counsel bad faith.  (See Feb. 27, 2023 Draft Hr'g Tr. at 11:21–12:14 ("And it starts from April of 2019, and again, this is evidence that we submitted with our briefing.  But the Plaintiffs' firm sent me personally a letter saying these are the claims that we are going to bring.  And it even goes as far as to argue how they are going to get around the arbitration clause.  But, oh, by the way, even if we don't, it's going to be

---

[19] In that vein, the Court finds that this has been an extremely contentious case where the attorneys on both sides have continually filed motions and oppositions (including, even this week ironically, with Defendants' opposing Plaintiffs' request to file a response to Defendants' recent notice of supplemental authority as to the instant motion).

expensive for you to defend it.").)  But Defendants' reliance on the April 4, 2019 letter, coupled

with Defendants' September 20, 2021 letter in which they threatened to bring Rule 11 sanctions

three days prior to the scheduled mediation, raises the question, Why did Defendants wait to

bring the motion for sanctions until November 29, 2022 if they thought Plaintiffs' counsel's

conduct was so egregious that it warranted sanctions well over a year prior?  Regardless,

although the Court does not encourage Plaintiffs' counsel's conduct with respect to the April 4,

2019 letter (specifically, glossing over the arbitration agreement and suggesting a lengthy and

expensive process will follow if Defendants did not meet their demands), the Court does not find

that it amounts to bad faith or intentional misconduct.

   The Court now turns to the substance of Plaintiffs' opposition to the motion to compel.

At the time Plaintiffs initiated this lawsuit and opposed CSPA's motion to compel arbitration, in

2019, the National Labor Relations Board ("NLRB") had issued its decision, *Prime Healthcare*

*Paradise Valley, LLC*, 368 NLRB No. 10 (June 18, 2019), in which the NLRB stated that an

arbitration agreement is unlawful if it can be reasonably interpreted to potentially interfere with

the filing of claims with the Board, or more generally, with administrative agencies.  There, the

employees were required to "waive their rights to pursue class or collective actions involving

employment-related claims in all forums," and the NLRB concluded that the arbitration

agreement, "when reasonably interpreted, restricted the filing of charges with the Board" and

was therefore unlawful.  Plaintiffs' counsel relied almost entirely on *Prime Healthcare* in

opposing the motion to compel, arguing that the arbitration provision restricted the filing of

charges with only the NLRB and therefore was unlawful.  (*See, e.g.*, Doc. No. 52-1 at 8–18; Doc.

No. 61 at 3–7.)

   As noted in this Court's February 9, 2022 Memorandum, this argument fails to challenge

the delegation clause of the arbitration provision specifically, as was required to succeed in opposing the motion to compel arbitration. (*See* Doc. No. 164 at 22–23). Although the Court finds the argument dubious,[20] the Court has difficulty concluding that this shows that Plaintiffs' counsel acted in bad faith, as opposed to zealous (and misguided) advocacy. *Cf. Pop Test Cortisol, LLC v. Univ. of Chicago*, Civil Action No. 14-7174, 2015 WL 5089519, at *10 (D.N.J. Aug. 27, 2015) ("Here, the Court finds that Plaintiff [sic] counsel's conduct does not rise to the level of bad faith necessary for the imposition of sanctions under § 1927 . . . . The Merck Individuals contend that Plaintiff's counsel has continuously and unsuccessfully opposed arbitration, despite the plain language of the agreement. However, the Court cannot find that Plaintiff's counsel's conduct is patently unreasonable or made in bad faith. Plaintiff's counsel advocated zealously by appealing an adverse order. Moreover, Plaintiff's counsel represents that he did not include the Merck Individuals as parties in this action for any improper purpose. Instead, Plaintiff's counsel zealously represented his client and relied on his interpretation, albeit erroneous, of the state court's ruling. Although the Court has recommended compelling arbitration here, the Court cannot find that Plaintiff's counsel acted in bad faith."); *Albertson v. Art Inst. of Atlanta*, Civil Action No. 1:16-cv-03922-WSD-RGV, 2017 WL 9474223, at *3 (N.D. Ga. Mar. 23, 2017) ("Defendants allege that they provided Albertson's counsel with a copy of the ADR Policy and requested that this action be dismissed, but that Alberton's counsel has refused to submit the claims to arbitration. The Court finds that there is insufficient evidence that the refusal by Albertson's counsel to withdraw the complaint and initiate arbitration, even if based on flawed legal arguments, constituted such egregious misconduct as to amount to bad

---

[20] In particular, the Court found it problematic that Plaintiffs' counsel's failed to cite to any district or circuit court decisions applying the law in this manner, ignored the *Rent-A-Center* decision, and did not recognize that *Prime Healthcare* related to an arbitration provision and not a delegation clause.

faith warranting sanctions under the exacting standards of § 1927.  Similarly, the Court's finding that Albertson's claims are subject to arbitration in this case is based on the merits of defendants' motion to compel and does not establish any unreasonable or vexatious conduct on the part of Albertson's counsel.").  Nor does the Court find that Deardorff's deposition testimony, indicating that her counsel encouraged her to pursue her claims in federal court, as opposed to arbitration, evidence bad faith.   Ultimately, the Court finds that Plaintiff's counsel's conduct reflected poor professional judgment, misunderstanding and misapprehension of the nuances of the applicable case law, and overzealous advocacy, as opposed to intentional misconduct or bad faith.[21]  *Contra Curry v. United Parcel Serv., Inc.*, Civil Action No. 17-2331, 2017 WL 4810701, at *2 (E.D. Pa. Oct. 25, 2017) ("Weisberg's conduct went far beyond zealous advocacy.  Indeed, it went further than mere rank incompetence. . . . A very basic principle of federal civil procedure, learned by all first-year law students (well, perhaps all but one), is that the court must have subject matter jurisdiction over the action. . . . Here, Weisberg filed a complaint which read, 'Respectfully, this Honorable Court does not have jurisdiction over this matter.'  The Amended Complaint was thus not only deficient, but this deficiency was known to counsel and memorialized on the second page of the filing."); *Johnson*, 2015 WL 1004308, at *14 (sanctioning counsel where counsel was "dishonest" and "felt no obligation to remain tethered to

---

[21] Defendants cite *Bakery, Confectionary, Tobacco Workers & Grain Millers Int'l Union v. Morabito Baking Co.*, Civil Action No. 10-CV-5141, 2011 WL 1883298 (E.D. Pa. May 18, 2011), to support their position that sanctions are warranted, but the Court is not persuaded.  First, the Court notes that nowhere in that opinion did the court mention bad faith—which, again, is required for the sanctions Defendants seek in the case before us.  (Nor did the court mention whether the sanctions it imposed were pursuant to § 1927, Local Rule 83.6.1, or the court's inherent authority—the authorities under which Defendants proceed here.)  *See generally id.*  Second, in that case, the respondent "refused to submit the dispute to arbitration, despite being unable to cite a single case holding that arbitration could not be avoided because of alleged noncompliance with a [sic] CBA's grievance procedure."  *Id.* at *4.  Defendants have failed to produce clear and convincing evidence that Plaintiffs' conduct in the instant case rises to the same level as the attorney in *Bakery, Confectionary, Tobacco Workers & Grain Millers Int'l Union*.

the truth").

**IV.      Conclusion**

For the foregoing reasons, the Court denies Defendants' motion for sanctions and

attorneys' fees.

An appropriate Order follows.